**CALCUTTA EAST COAST OF INDIA AND EAST PAKISTAN/U. S. A. CONFERENCE, Petitioner,**

v.

**FEDERAL MARITIME COMMISSION**
and
**United States of America, Respondents.**

No. 21335.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 24, 1968.

Decided July 25, 1968.

Mr. Elmer C. Maddy, New York City, with whom Messrs. Ronald A. Capone, Washington, D. C., and John Williams, New York City, were on the brief, for petitioner.

Mr. Robert N. Katz, Sol., Federal Maritime Commission, with whom Asst. Atty. Gen., Donald F. Turner, Messrs. James L. Pimper, Gen. Counsel, Joseph F. Kelly, Jr., Attys., Federal Maritime

Commission, and Irwin A. Seibel and W. Richard Haddad, Attys., Dept. of Justice, were on the brief, for respondents.

Before FAHY, Senior Circuit Judge, and McGOWAN and ROBINSON, Circuit Judges.

McGOWAN, Circuit Judge:

This statutory review proceeding involes a challenge by an ocean shipping conference to a Federal Maritime Commission order cancelling the conference agreement. That order rested upon a finding that the agreement was, by reference to the relevant statutory standard, "contrary to the public interest."[1] The attack upon the order is variously mounted, but we think the issue presented is essentially whether the events relied upon by the Commission, which involve the degree of compliance by certain conference members with subpoenas issued in a single rate proceeding, provide adequate support for its finding. In our view, they do not.

### I

The members of petitioner are common carriers by water in the trade between ports in the United States, in East Pakistan, and on the East Coast of India. Some members are under the United States flag, while others are foreign-flag lines. The conference agreement was approved by the Commission on March 31, 1964, and, since that time, the members have been operating under common tariffs. On July 11, 1964, petitioner entered into a Commission-approved dual rate contract with Ludlow Corporation covering the carriage of jute.[2] On July 6, 1965, petitioner filed increases in certain jute rates, and notified Ludlow that such new rates would be made effective November 11, 1965. Ludlow complained to the Commission of the increases, and a contested rate proceeding took shape with the filing of petitioner's response to the complaint, denying Ludlow's allegations of invalidity.[3]

Ludlow applied for the issuance of subpoenas *duces tecum* directed to each of the nine Conference members. The Examiner granted the application but limited its reach to documents located in the United States. Ludlow thereafter sought directly from the Commission nine additional subpoenas covering documents

---

1. Petitioner is subject to regulation under the Shipping Act of 1916, as amended (46 U.S.C. § 801 et seq.). Section 15 of that Act requires the immediate filing with the Commission of agreements between carriers which fix rates or otherwise regulate and restrict competition between the parties. The Commission's function with respect to agreements so filed is stated as follows:

    "The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. * * *"

    The vital consequence of Commission approval is exemption from the federal antitrust laws.

2. Section 14b of the Shipping Act (46 U.S.C. § 813a) permits carriers, with prior Commission approval, to enter into contracts under which a shipper may receive lower rates in consideration of his agreeing to give the carrier all or a fixed proportion of his business.

3. Section 18 of the Shipping Act (46 U.S.C. § 817(b) (2)) provides for the filing of rate increases by ocean carriers upon not less than 30 days' notice. The Commission is directed to "disapprove any rate or charge filed by a common carrier by water in the foreign commerce of the United States or conference of carriers which, after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States." 46 U.S.C. § 817(b) (5).

    Section 22 of the Act (46 U.S.C. § 821) provides for the filing of complaints, and empowers the Commission, subject to a 2-year statute of limitation, to "direct the payment * * * of full reparation to the complainant for the injury" complained of.

located outside the United States, and the Commission directed that such subpoenas be forthcoming. When the Conference declined to comply with any of the subpoenas, proceedings were instituted in the Southern District of New York to compel compliance. The District Court granted enforcement, Ludlow Corp. v. DeSmedt, 249 F.Supp. 496 (S.D.N.Y. 1966). This was affirmed by the Second Circuit, Federal Maritime Commission v. DeSmedt, 366 F.2d 464, and certiorari was denied, 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 437 (1966).

Back before the Commission, the four American-flag carriers and one foreign-flag member signified their readiness to produce all of the documents called for by the subpoenas. The remaining four foreign-flag members took the position that they could and would produce all their documents located in the United States, but that they were powerless under the laws of their sovereign nations —India, Great Britain, and the Netherlands—to produce such documents as were located outside the United States. The Commission instituted contempt proceedings against these four carriers in the Southern District but, after evidentiary hearings in which the asserted foreign legal limitations were explored, contempt relief was denied.[4]

The Commission thereupon directed petitioner to show cause why the Conference Agreement should not be cancelled "on a finding that said Agreement has been carried out in a manner contrary to the public interest." In its Report supporting the order of cancellation before us for review, the Commission said that "[T]he issue before us is simply whether we shall cancel, as no longer in the public interest, our previous approval of a conference agreement because a portion of the conference membership has failed to comply fully with the demands of an admittedly valid subpoena duces tecum." Characterizing this question as "fundamental to the effective regulation of our water-borne foreign commerce," the Commission concluded that "[W]ithout the information called for by the subpoenas, we cannot discharge our duty under section 22 of the Act to investigate all properly filed complaints, and if we conclude that there has been a violation of the statute, to provide appropriate relief." Elsewhere in the Report the Commission articulated the necessity for cancellation in even broader terms by saying that "here we are confronted with a situation that permits of only one solution for it is the very integrity of the regulatory program of this country which is at stake. * * * "

## II

The question before us in this statutory review proceeding is not whether the subpoenas issued in the Ludlow complaint proceeding contained any infirmities. We take them to be wholly valid, both in terms of (1) the relevance of the information sought to that proceeding and (2) the Commission's statutory authority to seek that information. Neither is there before us the propriety of any order by the Commission either denying or upholding the validity of the increased rates on jute filed by petitioner and objected to by Ludlow. The record before us shows nothing with respect to the eventual disposition of that proceeding. The question we confront, rather, is whether the Commission's cancellation of the Conference Agreement is supportable, and that, in turn, is translatable into the issue of whether the failure of some of the Conference members to comply with the subpoenas in every particular provided an adequate foundation for the Commission's conclusion that the continued existence of the Conference Agreement was, in the

4. In an unreported opinion the District Judge, who had originally ordered enforcement of the subpoenas, found that the respondents cited for contempt had made good faith efforts to comply fully with the subpoenas but had been prevented from doing so by legal restrictions imposed by their respective "friendly and foreign nations who have maintained, and still have, diplomatic relations with the United States * * *." Joint Appendix 24.

language of the statute, "contrary to the public interest."

■■ In bringing our judgment to bear on the Commission's action, we ought not to revise that action simply because we may happen to think it ill-considered, or to represent the less appealing alternative solution available to the Commission. *See, e. g.,* Consolo v. Federal Maritime Comm., 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). A court has no warrant to set aside agency action as arbitrary or capricious when those words mean no more than that the judges would have handled the matter differently had they been agency members. Judicial intervention must, instead, be rested upon a demonstration that the agency action has transgressed the statutory boundaries, either because it is beyond the scope of statutory authority or because the findings underlying it lack significant support in the record. As to the former, the Congressional purpose is clear that cancellation of existing agreements, as well as initial approval of new ones, is expressly within the ambit of Commission authority and responsibility. What is far less clear in this instance is the nexus between the subpoena problems encountered in the Ludlow complaint proceeding, on the one hand, and the Commission's conclusion that the continued life of the Conference Agreement was incompatible with the public interest, on the other.

Five of the Conference members, including one foreign carrier, stood ready to supply all of the information called for by the subpoenas. It appears that the four remaining foreign carriers were able and willing to furnish a substantial amount of the information sought,[5] but were foreclosed by the sovereignties to which they were subject from supplying the remaining information from records located outside the United States. The Commission made no findings as to the amount or adequacy for the purpose of

determining lawful jute rates of the information available, as distinct from that which was not forthcoming. It did not challenge in any way the fact of legal restrictions imposed upon the noncomplying foreign-flag members, nor their good faith in protesting their willingness to comply fully with the Commission's subpoenas, had it not been for the prohibiting commands directed to them by their sovereigns. Rather, the Commission found generally that the absence of any part of the information called for rendered it unable to "discharge our duty under section 22 of the Act to investigate *all* properly filed complaints," and not simply the only one then pending, namely, the Ludlow complaint against the increase in jute rates. It concluded that its failure to cancel the Conference Agreement under these circumstances "would grant the parties thereto that 'unrestricted right of action' which Congress itself withheld in 1916. * * * "

This finding is surely a sweeping one when viewed in the appreciably narrower factual context giving rise to it. It amounts to saying, first, that, because there is to be less than complete compliance with the subpoenas in the Ludlow case, the Commission will be unable to function with respect to any and all other rate complaints. And, second, it assumes that carriers who are not at liberty to supply all information which may be relevant to a rate increase sought by them thereby automatically regain all the freedom of action which they had before the regulatory scheme was imposed.

That "freedom of action" was, of course, the right to act in concert with competitors, but under the lowering shadow of the antitrust laws and at the risk of the pains and penalties they provide. The regulatory purpose of Congress was to lift that shadow in return for close Commission supervision under standards designed to minimize the ad-

---

5. Judge Ryan in the contempt proceeding found that the respondents "have produced all documents and records called for by the subpoenas excepting only net revenue figures requested in items I-A, I-B and I-C and the port and stevedoring costs specified in item I-G for ports other than those in the United States."

verse impact of concerted action upon the public interest but, at the same time, to realize the benefits in the public interest which Congress saw in concerts of action in the ocean carrying trade. One—but only one—of the dangers, of course, was that presented to shippers in the form of rate increases agreed upon in common by otherwise competitive carriers. It was this threat that caused the Congress to endow the Commission with the power to scrutinize such increases and to set them aside if found to be incompatible with the statutory tests.

Petitioner argues that, had the Commission proceeded to hearing upon the Ludlow complaint, it might well have found the information available adequate to adjudicate the propriety of the increases. It goes beyond this position, however, and asserts that the Commission is, at the least, free to treat the burden of proving the legality of the new rates as resting upon petitioner and, to the extent that relevant information essential to the carrying of that burden is missing, albeit through no fault of petitioner or any of its members, to disapprove the increased rates. It might indeed, so says petitioner, strike the jute rates completely from the tariff, declare them "open" and thereby no longer covered by the Conference Agreement. See Imposition of Surcharge by the Far East Conference at Searsport, Maine, 9 F.M.C. 129 (1965).

It appears to us that these alternatives undermine significantly the Commission's characterization of the situation as one "that permits of only one solution." It was obviously not the solution envisaged by the Second Circuit when, in the opinion by Judge Friendly upholding the subpoenas here in question, it was said that the foreign carriers "may prefer to produce at least some of the desired information [rather] than risk *disapproval of rates* for failure of proof. * * *" Federal Maritime Commission v. DeSmedt, 366 F.2d 464, 473 (emphasis added). It is also a solution patently out of keeping with that directed by the Supreme Court in a different, but far from inapposite, context. Societe Internationale etc. v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). There, a plaintiff in a federal district court was unable to effect 100% compliance with a discovery order because the Swiss Government forbade the release of some of the information. The Supreme Court held that, under these circumstances, it was error to dismiss the complaint with prejudice, and that, rather, plaintiff should have been permitted to proceed to trial upon the evidence that was available. The Court noted that this did not relieve plaintiff, though innocent of any responsibility for the incomplete discovery, of all of the adverse consequences thereof (at pp. 212–213, 78 S.Ct. at p. 1096):

" * * * It may be that in a trial on the merits, petitioner's inability to produce specific information will prove a serious handicap * * *. It may be that in the absence of complete disclosure by petitioner, the District Court would be justified in drawing inferences unfavorable to petitioner as to particular events. So much indeed petitioner concedes. But these problems go to the adequacy of petitioner's proof and should not on this record preclude petitioner from being able to contest on the merits."

The policing of conference agreements involves other matters than rate increases, and it may well be that there are some investigative proceedings where the inability of the conference to supply information would leave the Commission with no alternative but to cancel the agreement. See Note, Rate Regulation in Ocean Shipping, 78 Harv.L.Rev. 635, 642–44 (1965). In rate complaint cases, however, the Commission always has available to it the sanction of disapproval—a sanction which may presumably be imposed where the Commission finds itself unable to reach a rational determination because of the unavailability of relevant data. This may have been such a case, but we cannot see that the Commission has, after serious effort, found it to be so. The Commission finds

instead that inability to supply a part of the evidence requested in one rate complaint case completely frustrates its power to police the Agreement and thus leaves cancellation as the "only solution" compatible with the public interest. That is a finding for which, in this record at least, there is less than adequate support.

The international character of the ocean carrying trade inevitably creates problems in the regulation provided by a single sovereign. But it was precisely this international character which caused the Congress to decide that it was in the public interest for ocean carriers—foreign and domestic—to form conferences. Congress is not unaware of the difficulties felt by the Commission to reside in the restraints imposed by foreign governments upon the furnishing of information by their nationals. In 1961 the Congress was explicitly invited to make initial or continued approval of conference agreements contingent upon an undertaking by each member to provide all records requested by the Commission, wherever such records were located. The Senate however, rejected this approach, in circumstances in which the Commission's immediate predecessor found itself ranged in opposition to the State Department which strongly represented that severe injury to the conduct of foreign policy would be entailed. See Sen.Rep.No. 860, 87th Cong., 1st Sess. (1961); U.S. Code Congressional and Administrative News, p. 3108.

The failure of the Congress to embrace this change may or may not have been wise, but it is clear that that failure followed the pressing upon it of the very considerations which have impelled the Commission to conclude that cancellation of the instant agreement "permits of only one solution." It is always hazardous to infer too much in the way of legislative intent from negative action, but this Congressional rejection has at least some minimal implications for what Congress would conceive of as circumstances necessitating the termination of a conference agreement as "contrary to the public interest." We doubt whether, under the statute as currently written, it would descry such circumstances in the present record. In any event, we are unable to find them present to a degree commensurate with the requirement that the evidence supporting an administrative finding must be substantial.

The Commission's order under review is set aside, and the case remanded to the Commission for further proceedings consistent herewith.

It is so ordered.