**M. STEINTHAL & CO., Inc.**

v.

**Robert J. SEAMANS, Jr., Secretary of the Air Force,**
**Pioneer Parachute Co., Inc., Appellant.**

**No. 24595.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 1970.

Order Sept. 17, 1970.

Opinion Oct. 14, 1971.

Tamm, Circuit Judge, dissented.

Mr. Gerald D. Stern, New York City, with whom Messrs. Leonard H. Becker, Washington, D. C., and Daniel P. Levitt, New York City, were on the pleadings, for appellant.

Mr. Robert M. Werdig, Jr., Asst. U. S. Atty., for appellee Seamans. Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry and Joseph M. Hannon, Asst. U. S. Attys., also entered appearances for appellee Seamans.

Mr. Alvin A. Simon, New York City, a member of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Rex-

ford T. Brown, Washington, D. C., was on the pleading, for appellee M. Steinthal & Co., Inc.

Before WRIGHT, TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case involves a protest by a bidder for a government contract. Plaintiff-appellee Steinthal & Co. contests a determination by the Air Force rejecting what Steinthal alleges was the lowest bid on a contract to supply parachutes and directing a readvertisement of bids. The District Court granted a permanent injunction restraining the Secretary of the Air Force from opening bids submitted pursuant to the readvertisement and from awarding a contract for the parachutes to any bidder other than Steinthal. At the oral argument, on the application of intervenor-appellant Pioneer Parachute Co. for a stay pending appeal, the parties agreed that this court could proceed to dispose of the merits of the appeal. In view of the urgency of the situation, we issued an order within a few days after oral argument, reversing the ruling of the District Court and dissolving the permanent injunction in order to allow the Air Force to open the resolicited bids and to award a contract for the parachutes.

In Scanwell Laboratories, Inc., v. Shaffer[1] we held that a bidder for a government contract had standing under the Administrative Procedure Act to obtain judicial consideration of a claim of illegality in the award of the contract to another.[2] In this opinion we consider the approach that is appropriate when an action under *Scanwell*, claiming that pro-

---

1. 137 U.S.App.D.C. 371, 424 F.2d 859 (1970).

2. Standing was grounded on two inter-substantive interest as an aggrieved party substantive interest as an aggrieved party in asserting that it was denied the contract because of arbitrary or capricious agency action, 5 U.S.C. § 702 (Supp. V, 1965–69). See Scanwell Laboratories, *supra* note 1, 137 U.S.App.D.C. at 377–385, 424 F.2d at 865–873; and (2) the

public interest in policing governmental action through frustrated bidders serving as "private attorney generals." *Scanwell Laboratories*, 137 U.S.App.D.C. at 376, 424 F.2d at 864. *See* also National Coal Ass'n v. FPC, 89 U.S.App.D.C. 135, 137–138, 191 F.2d 462, 464–465 (1951); Associated Industries of New York State, Inc. v. Ickes, 134 F.2d 694, 704 (2d Cir. 1943), vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943).

curement officials have acted arbitrarily or capriciously, confronts the court with technical and complex issues of interpretation of procurement regulations. It is being issued simultaneously with the opinion in Wheelabrator Corp. v. Chafee, #24705, 147 U.S.App.D.C. ——, 455 F.2d 1306, which involves related considerations.

## I. THE PRESENT CONTROVERSY

### A. *The Background*

On May 1, 1970, the Secretary of the Air Force, Robert Seamans (appellee), issued an invitation for bids [IFB#1] through the Department of Procurement and Production [DP&P], Kelly Air Force Base, San Antonio, Texas. The IFB covered a contract involving the production and delivery of 1040 parachutes.[3] The delivery schedule of IFB#1[4] provided:

Part III *Desired Delivery*

Delivery is desired as follows:

| 140 Days | 170 Days | 200 Days |
|---|---|---|
| 40 | 40 | 80 and continue at the rate of 80 each per month thereafter |

This schedule was made subject to a slippage provision:

> If the bidder is unable to meet the above delivery schedule, he may, without prejudice to the evaluation of his bid, set forth below the delivery schedule he is prepared to meet, provided, in no event shall the bidder's delivery schedule [extend beyond 30 days] after completion date of each increment specified above, as bids proposing delivery after that period will be con-

sidered nonresponsive to the invitation and will be rejected. If the bidder does not state a different delivery schedule, the Government's desired delivery schedule will apply.

The brackets surrounding the phrase "extend beyond 30 days" were not in slippage clause as issued. They have been used to signify the fact that this phrase was deleted by an amendment issued June 1 [amended IFB]. This amendment also revised the delivery schedule by providing that the first shipment[5] would be due 120 days after the award. The bid opening was extended from June 2 to June 30 in order, as the record shows,[6] to allow a third manufacturer to qualify for the bidding by satisfying the Air Force's requirements.

The intention of those drafting the amendment of the slippage clause, as the record indicates, was to respond to the delay occasioned by the deferral of the opening of bids from June 2 to June 30, and to the need of the buyer for the first 40 parachutes by January 15, 1971, by deleting the entire slippage provision. The intent was to provide for a mandatory schedule of delivery of the parachutes.

Although none of the prospective bidders questioned the provisions of the amended IFB, each of the three bids opened on June 30 reflected a different interpretation of its provisions. Pioneer Parachute Co., Inc., interpreted the amended IFB to establish a *required* delivery of the first shipment of parachutes within the stated 120 day period. M. Steinthal and Co. concluded that the amendment called for a *desired* delivery schedule and submitted a bid providing

---

3. The only bidders eligible for IFB#1 were those manufacturers whose parachutes had passed Air Force Specification tests and, therefore, were included in a Qualified Products List prepared by the Secretary of the Air Force.

4. The delivery schedule was devised to enable the buyer to receive the first increment of parachutes no later than January 31, 1971.

5. A typographical error in the amended IFB provided that the first shipment was to contain 408 parachutes; however, this was subsequently corrected to reflect the correct quantity of "40" parachutes.

6. See, *Statement of Facts and Findings*, of Contracting Officer (July 8, 1970) (Protest Before Award IFB F41608–70–B–1250) (Exhibit C to Appellant's Motion for Temporary Restraining Order Pending Appeal).

for delivery within 150 days of the award. A third bidder's response provided for initial delivery within 170 days of the award.

The third bidder specified the lowest price, but its parachute did not meet specifications. Steinthal's price was lower than Pioneer's, but Pioneer protested the award of the contract to Steinthal contending that Pioneer had submitted the only bid responsive to the delivery schedule in the amended IFB.

Pioneer's protest was originally considered by Joseph R. Blazi, the Contractting Officer at Kelly Air Force Base.[7] On July 8 he issued a *Statement of Facts and Findings* in which he denied the protest and recommended award of the contract to Steinthal. Mr. Blazi found that the deletion of "extend beyond 30 days" rendered the amended IFB "subject to two possible interpretations": (a) as specifying a mandatory schedule; however he noted that this ignored the presence of "desired" in the delivery schedule, and the absence of "required." (b) as providing a desired delivery schedule, with delivery required only within a reasonable time after the desired date. His analysis, set forth in the footnote,[8] culminated in the opinion that the second construction should be adopted, although he expressly concluded that he found it impossible to state whether this interpretation advanced by Steinthal was more sound than Pioneer's "mandatory" interpretation and he could "only conclude that neither interpretation is superior to the other." He recommended award of the contract to Steinthal since he found that directing a readvertisement of bids after opening would cause substantial prejudice to Steinthal but would only slightly disadvantage Pioneer because, as he found on the basis of his experience with these contractors, Pioneer's bid would not have been lower even if it had proposed the same delivery schedule as Steinthal.[9]

7. As provided by ASPR 2.407–9(a) and 2.407–9(b), 32 C.F.R. 2.407–9(a) and 32 C.F.R. 2.407–9(b) (January 1, 1971).

8. The Statement of Facts and Findings states in pertinent part:
 (a) the deletion of the phrase "extend beyond 30 days" as a result of in affect [sic] placing a zero in the space provided or, in other words, allow no extension whatsoever; (b) the deletion of the specific limitation with the other language remaining has the affect [sic] of permitting bidders to determine their own amount of extension resulting in the only limitation being one of reasonableness. Analyzing the first rationale it may be argued that the deletion of any specific number of days clearly indicated the Government's intention to *require* delivery within the time increments specified in the *desired* schedule. The difficulty with this interpretation is that it ignores the *presence* of the word "*desired*" and the *absence* of the word "*required*". To attempt to convert a stated "*desired*" schedule to a "*required*" schedule by such circuitous and strained reasoning is not within the purview of proper construction of contractual documents. The statement "desired delivery" should not be converted to mean something else unless the other meaning is abundantly clear. It is the opinion of the Contracting Officer that the second construction of the delivery language should be adopted. i. e., the IFB as amended resulted in a desired delivery schedule only and did not in fact contain a required delivery schedule. In such case awards have been permitted on the basis of a reasonable time after the desired date (Comp.Gen. B–155035, Nov. 20, 1964). * * * Under the factual situation existing herein I find it impossible to state that, if it be determined that an ambiguity exists therein, the interpretation by Pioneer is more sound and reasonable than that of Steinthal. At best, I can only conclude that neither interpretation is superior to the other.

9. The contracting officer's sole criterion for consideration of the prejudice to Pioneer was whether "the ambiguity with regard to delivery schedules mislead Pioneer into bidding a shorter delivery schedule in turn causing increased costs by virtue of overtime or otherwise and thus resulting in Pioneer's bid being higher than it would have been had they construed the delivery provisions as, permitting a schedule longer than 120 days." After surveying past contractual relationships of the Air Force with Pioneer, he concluded:
 Thus, it is my opinion, as supported by pricing personnel and based upon over six years experience dealing with

This *Statement of Facts and Findings* was then submitted by the contracting officer to Air Force Logistics Command at Dayton, Ohio (HQ, AFLC).[10] Subsequently, he received a list of *Comments* which contained "certain basic rules that must be adhered to"[11] in formal advertising, stressing the need to preserve a competitive bidding system by solicitations permitting competition on an equal basis, without deviations from delivery provisions through waiver or reservation to the contracting officer of freedom to determine whether delivery time should be a factor in the award. The *Comments* also directed specific criticism at the following two determinations in the *Statement*: (1) where an IFB contains only a desired schedule, award can be made on a schedule, such as that proffered by Steinthal, that is reasonable in relation to the desired schedule; and (2) based on pricing experience, Pioneer would not have been the low bidder even if Pioneer's delivery schedule were the same as that of Steinthal.[12] The position of HQ, AFLC on these two issues was tersely stated:

> The Comp. Gen. * * * has overruled prior decisions permitting open

ended delivery requirements. Further, the ASPR has specific provisions concerning time of delivery and how it will be set forth in solicitation * *; no authorization is given for open ended delivery provisions. How much Pioneer's bid would be reduced if based on a different delivery schedule is pure conjecture and we are not aware of any procedure that can be applied to permit evaluation under such circumstances. The facts in this case present a compelling reason to reject all bids and readvertise.

The contracting officer then reevaluated his findings in light of the Comments,[13] determined that the invitation should be cancelled because of the ambiguity in the delivery schedule, and informed the parties on July 17 that there would be a readvertisement. Pioneer immediately protested the cancellation to the DP & P and requested a determination of "where [the] ambiguity exists." On July 20, the contracting officer issued a telegram in which he more fully explained his cancellation decision.[14] On July 21, Grason Keene, another contracting officer at DP&P, responded specifically to Pioneer's protest, concluding that

---

these same contractors, that under any construction, Pioneer would not have been the lowest bidder even if Pioneer's bid were the same as Steinthal as to delivery.

10. 32 C.F.R. 2.407–9(a) (January 1, 1971). See also, HQ, USAF, ASPR Supplement, 2.407–9(a) and (b). 5 CCH Contracts Reporter ¶ 41,542.20. Headquarters, Air Force Logistics Command is considered a "Major Command Headquarters" under the latter provision.

11. The *Comments* stated
 1. In dealing with any advertised procurement, there are certain basic rules that must be adhered to, such as, the following:
 a. The solicitation must be drawn so as to permit competition on an equal basis.
 b. An IFB shall *not* be drafted in such a way as to reserve to the contracting officer, based upon review of delivery requirements at the time of award, will be a factor in making award.

c. Deviations in a bid from the advertised provisions relative to delivery go to the substance of the bid and cannot be waived as mere informalities.
 d. Preservation of the competitive bidding system is more beneficial to the Government from a long range standpoint than the pecuniary savings which might be realized in an individual case.

12. Note 9, *supra*.

13. Affidavit of Joseph R. Blazi, August 20, 1970.

14. Although this telegram was not introduced into the record below, there is no dispute as to its factual accuracy. (Exhibit A to Reply Memorandum to Opposition to Motion for Summary Reversal.) In the interest of a prompt and just disposition, we considered it on the appeal, as it were on a constructive, consented, motion to amplify the record. United States v. Kearney, 136 U.S.App.D.C. 328, 331 at note 4, 420 F.2d 170, 173 at note 4 (1969).

the IFB was ambiguous because subject to more than one reasonable interpretation:

2. With specific reference to your question regarding ambiguity the IFB as amended resulted in two reasonable interpretations as to delivery schedule. First the schedule contained in the IFB indicates a required delivery to commence in 120 days after award. This interpretation results from the deletion of the phrase /extend beyond 30 days/ /amendment No. 1/ and therefore results in having the effect of placing a zero in the space provided or in other words allowing no extension whatsoever. However another equally reasonable interpretation of the deletion of the specific limitation with the other language remaining is that it results in an open ended delivery schedule thereby permitting bidders to determine their own amount of extension with the only limitation being one of reasonableness.

3. Since more than one reasonable interpretation can be applied based on the above it is concluded that the delivery schedule as amended is ambiguous. Therefore your protest is considered to be without any reasonable degree of foundation and is denied.

On July 20 DP&P issued a new solicitation for bids (IFB#2) which expressly provided a required delivery schedule.[15] Both Pioneer and Steinthal then protested to the Comptroller General the cancellation of the amended IFB and the readvertisement. On August 13, the day before bids were scheduled for opening, the Comptroller General denied both protests and upheld the cancellation because the delivery schedule in IFB#1 as amended represented "an inadequate expression of the Government's needs" for immediate delivery.[16]

15. IFB#2 originally scheduled the opening of bids for August 4, 1970; however, this date was subsequently changed to August 14, 1970. The IFB also contained a required delivery schedule: "Delivery is REQUIRED by the Government in accordance with the following Schedule:

| Item Nr. | 150 Days | 180 Days | 210 Days | |
|---|---|---|---|---|
| 1 | 40 | 40 | . 80 | and continue at the rate of 80 each per month thereafter until complete. |

"(b) Bids offering delivery of each quantity within the applicable delivery period specified above will be evaluated equally as regards time of delivery. Bids offering delivery of a quantity under such terms or conditions that delivery will not clearly fall within the applicable delivery period specified above will be considered nonresponsive and will be rejected. Where a bidder offers an earlier delivery schedule than that called for above, the Government reserves the right to award either in accordance with the REQUIRED schedule or in accordance with the schedule offered by the bidder. If the bidder offers no other delivery schedule, the delivery schedule stated above shall apply."

16. Letter of Comptroller General to Pioneer Parachute (August 14, 1970) at 4: The question of interpretation entirely aside, it is very clear from the record that the amended delivery provision is an inadequate expression of the Government's needs. The contracting officer has stated that due to administrative oversight, there was a failure to change the "desired" schedule in paragraph (a) to a "required" schedule and a failure to delete paragraph (c) in its entirety. Instead of effecting the intended change and because of an apparent misunderstanding between the buyer and the procuring contracting officer, paragraph (c) continued to be designated as a "desired" schedule, and only the phrase "extend beyond 30 days" was deleted from paragraph (c). Thus, we have a situation where required delivery is stated in terms of permissive desired delivery.

Steinthal then filed this action in the District Court alleging that the cancellation of the amended IFB was arbitrary and capricious and requesting injunctive relief to prevent the opening of bids under IFB#2 and the award of the contract to any other bidder. Pioneer intervened. The Secretary of the Air Force filed a motion to dismiss, or alternatively for summary judgment. The District Court, after oral argument, denied the Secretary's motion and granted plaintiff Steinthal's motion for a permanent injunction, enjoining the opening of new bids and the awarding of a contract to anyone other than plaintiff Steinthal

> for the reasons that (1) there is and was no basis for any new solicitation and (2) plaintiff [Steinthal] would be unduly prejudiced by the issuance of and [sic] award pursuant to any such new solicitation, the previous solicitation * * * having been properly issued.[17]

17. The District Court's Findings of Fact and Conclusions of Law were set forth in its Memorandum Opinion filed September 3, quoted below in fn. 19.

18. This court granted appellee Secretary's motion for immediate issuance of the mandate on September 21, 1970.

19. Memorandum Opinion in Steinthal & Co. v. Seamans, et al. Civ.Action No. 2422–70 (September 3, 1970) at 7. The full text of this section of the District Court's opinion follows:

"In support of this finding, the Court notes the following: In response to Pioneer's protest the Contracting Officer issued the aforementioned six page 'Statement of Facts and Findings,' which found that the delivery schedule contemplated by [the amended IFB] has been 'desired' rather than 'required'; that even giving Pioneer's allegations full width, the time differential if figured in Steinthal's bid would still make plaintiff Steinthal the lower bidder. The Contracting Officer, Mr. Blazi, has considerable expertise in this position and his Statement of Facts and Findings, as well as his testimony, was well reasoned and evident of a thoroughly considered opinion. It should be pointed out that he has been in his present position at Kelly Air Fooae

Pioneer appealed, and we granted a temporary stay and set argument to consider Pioneer's motion for stay pending appeal. At the oral argument on September 10, 1970, both Steinthal and the Government acquiesced in Pioneer's request for immediate determination on the merits of the appeal from the permanent injunction. This court issued a judgment on September 17, 1970, reversing the District Court and dissolving its injunction in order "to permit the Air Force to open the resolicited bids and to award a contract for the parachutes." [18] Judge Tamm dissented.

## B. *The Merits of the Appeal*

◼ The District Court based its injunction on the ground that "the cancellation [of the amended IFB] on the basis of ambiguity in the delivery schedule [was] arbitrary and without legal foundation." [19] We conclude that Steinthal has not met the heavy burden resting on anyone seeking reversal of a determina-

[sic] Base, Texas, for a period of six years.

"While Mr.. Blazi did point out the confusion caused by [the amended IFB], he concluded that 'the second construction of the delivery language should be adopted; i. e., the IFB as amended resulted in a desired delivery schedule only and did not, in fact, contain a required delivery schedule.' Although not germane to his decision, he noted that if the contract were awarded expeditiously, then that would still meet with the Air Force's required date of January 1, 1971. Ultimately, the Contracting Officer concluded that 'definite prejudice would result * * * to Steinthal by virtue of disclosure of [its] bid price should the decision be made to readvertise. An IFB should be cancelled after opening only for the most compelling reasons (ASPR 2–404.1 (a).' Mr. Blazi found no such compelling reasons at that time.

"The Court finds that there was a substantial basis in fact for Mr. Blazi's conclusions.

"Thereafter, plaintiff was notified that [the amended IFB] had been canceled.

"The government offered as a basis for Mr. Blazi's ultimate change of mind a memorandum from a legal offi-

tion by procurement officials that there is ambiguity in a bid invitation which warrants readvertisement.

1. *The District Court Failed To Consider the Entire Administrative Process of Review of Bid Protests.*

█ The District Court found (1) that there was a substantial basis in fact for the conclusions of the contracting officer, Mr. Blazi, in his Statement of Facts and Findings of July 8, and (2) that there was no rational basis for his subsequent refutation of these findings, or any other rational basis for the Air Force to reverse the award determination of Mr. Blazi. We disagree. The regulations establish a chain of review for consideration by the Air Force of bidder protests made prior to the award of a contract.[20] The contracting officer

is required to submit a Statement of Facts and Findings [21] to HQ, AFLC, which is authorized to "render final decisions on protests * * * which are lodged at no higher than Major Command levels." [22] In accordance with this procedure, Mr. Blazi, after requesting a legal memorandum from the Chief of Procurement Law at Kelly Air Force Base,[23] prepared a Statement which reveals that he ultimately rejected the conclusion of that officer that "the weight of law in such a situation would support cancellation of [the amended IFB] and readvertisement." [24] HQ, AFLC then provided the contracting officer with its Comments explicating its disagreement with the Statement and concluding that "[t]he facts in this case present a compelling reason to reject all bids and readvertise." Mr. Blazi's reconsideration of his prior decision and

cer advising against the acceptance of the bid of Steinthal. However, Mr. Blazi admitted having received the memorandum six days before he issued his Findings of Fact, so that he undoubtedly took it into account before doing so. In response to questions, Mr. Blazi stated that not only did [the amended IFB] use the language 'desired' but that were another IFB issued, it also would contain the word 'desired' rather than the mandatory word 'required.' The cancellation gave no compelling reasons for the Contracting Officer's change of position. It contained no detailed explanations as to why the protest was reconsidered. Nor did it allege any new facts which would warrant a reversal of Mr. Blazi's conclusions. In no way could the cancellation be construed to refute Mr. Blazi's previous findings.

"Consequently, the Court finds that the Government has presented no evidence which would legitimately warrant reversal of the contract award, and that, in fact, the government's action was arbitary [sic] and capricious."

20. See HQ, USAF, ASPR Supplement § 2.407–9(a), *supra* note 10.

21. *Id.* at 2.407–9(b). We find nothing in the record to support appellee Steinthal's contention that the contracting officer's Statement of Facts and Findings was intended, contrary to the express

language of HQ, USAF, ASPR Supplement § 2.407–9(a) and (b) to be the definitive determination of the parties' protests.

22. See HQ, USAF, ASPR Supplement § 2.407–9(a), *supra* note 10.

23. The District Court was "clearly erroneous" in finding that this advisory memorandum of July 2 was offered by the Government "as a basis for Mr. Blazi's ultimate change of mind." What the Government plainly argued is that the *Comments* from HQ, AFLC, received by the contracting officer after submission of the July 8 *Statement* to HQ, AFLC, were the basis for his reevaluation of the *Statement.*

24. The legal officer's memorandum stated: 2. By Amendment 0001 an ambiguity was created in the delivery schedule in that it cannot be determined if the Government intended a required delivery schedule in increments of 120 days, 150 days, and 180 days, or if this schedule was merely a desired delivery schedule. Since all three bidders submitted their bids based on different delivery schedules, there appears to be prejudice to at least one of the bidders, and the Government is unable to evaluate the bids on a common basis. The weight of the law in such a situation would support cancellation of the IFB and readvertisement. (Reference 46 Comp Gen 745; 41 Comp Gen 599; and No. B–164749, 26 Aug 68.)

cancellation of bids, in the light of the legal interpretation provided by his superiors in the chain of command who were authorized to "render the final decision" in bid protests, does not provide a sound basis for condemnation of the executive action as arbitrary or capricious. Reconsideration at an action level in the light of legal analysis provided at a review level is an entirely reasonable corollary of the review process. The review process is a legitimate check on the decision-making process in the executive branch of government as it is in the judicial branch.

The cancellation of bids by the contracting officer following review of his Statement was reasonable, even if we assume, for purposes of this decision, that the District Court correctly found that the reasoning underlying the cancellation was the same as the analysis that had been supplied to him and rejected six days before his Statement.[25] It seems to us neither strange nor unreasonable that a contracting officer might not be convinced by the analysis in an advisory opinion of a legal official in the contracting office, an opinion that was designed to aid him in the preparation of his recommendation, and nevertheless accept guidance to the same effect provided by the officials authorized to review his Statement and to render final decision on a protest. This reversal of view may be attributed to the greater care and reflection that an official naturally accords to any determination pinpointed by his superior as questionable,

and to a recognition of the breadth of experience and awareness of government practice and precedents reasonably ascribable to the higher command.

We are, finally, concerned that the District Court did not even consider the opinions of the Comptroller General denying the protests of Pioneer and Steinthal and upholding the government's cancellation of the bids under the amended IFB. We are not called upon to make a formal determination concerning the controversy over the legal authority of the Comptroller General to issue decisions in bid protests, and the effect of such determinations on agency procurement policies.[26] Certainly we must acknowledge that the office headed by the Comptroller General provides unique experience in the area of government procurement and a tradition of care and objectivity, including freedom from prior involvement in the matter at hand, that would have provided "the court with additional guidance in resolving the issues before it."[27]

■ The above discussion illuminates our concern with the responsibility of courts to consider the totality of the administrative process in their review of agency action. Such an approach would serve to ensure the requisite judicial deference to well-reasoned judgments of agency officials acting within the confines of their statutory delegated authority and their own agency regulations. In the field of government procurement the courts must be sedulous to heed the admonition that their authority to va-

25. In our view the two documents were complementary rather than repetitive. The legal memorandum of July 2 concluded that ambiguity was present in the delivery schedule but recommended the award of the contract to Steinthal because of the prejudice to the respective parties from readvertisement. The *Comments*, without specifically raising the issue of ambiguity, supplied the contracting officer with certain tenets of formal advertising and with specific criticisms of his *Statement* in order to enable him to reevaluate his prior recommendation.

26. *See* Cibinic and Lasken, The Comptroller General and Government Con-

tracts, 38 Geo.Wash.L.Rev. 349, 374–383 (1969).

27. Page Communications Engineers, Inc. v. Stanley R. Resor, Secretary of the Army, C.A.D.C., No. 24,784 (decided December 24, 1970) xeroxed opinion at 2. Our opinion as to the value and significance of determinations of the Comptroller General, when available, is not inconsistent with our prior ruling that a bidder who is unable to obtain effective relief from the Comptroller General is not required to exhaust that remedy as a prerequisite to judicial review. *Scanwell, supra* note 1, 137 U.S.App.D.C. 371, 387–388, 424 F.2d 859, 875–876.

cate and enjoin action that is illegal must be exercised with restraint less the courts fall into the error of supposing that they may revise "action simply because [they] happen to think it ill-considered, or to represent the less appealing alternative solution available." Calcutta East Coast of India and East Pakistan/USA Conference v. Federal Maritime Commission, 130 U.S.App.D.C. 261, 264, 399 F.2d 994, 997 (1968). As we there said:

> A court has no warrant to set aside agency action as arbitrary or capricious when those words mean no more than that the judges would have handled the matter differently had they been agency members. Judicial intervention must, instead, be rested upon a demonstration that the agency action has transgressed the statutory boundaries. *Id.*[28]

2. *There Was a Reasonable Basis for the Cancellation of Bids Under the Amended IFB Because of an Ambiguity in the Delivery Schedule.*

We now consider, with the above perspective, whether the cancellation of the bids after opening was in contraven-

tion of the ASPR regulations, which have the force and effect of law,[29] governing the Air Force's consideration of bid protests.

Cancellation of bids after opening is limited by ASPR:

> The preservation of the integrity of the competitive bid system dictates that after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsible bid, unless there is a compelling reason to reject all bids and cancel the invitation.[30]

However, the regulations do permit the contracting officer to cancel bids if he determines that one of certain factors is present[31] including "inadequate or ambiguous specifications cited in the invitation."

In contending that the cancellation in the instant case is not consistent with the Air Force's own regulations plaintiff Steinthal rests almost entirely on the contracting officer's Statement of July 8 *(supra,* at note 8 and text thereto). We begin our analysis with that document and note at the outset that this initial Statement plainly reflects recogni-

---

28. *See also,* Gulf Oil Corporation v. Hickel, 140 U.S.App.D.C. 368, 435 F.2d 440, 444–445 (1970); Udall v. Washington, Virginia and Maryland Coach Company, Inc., 130 U.S.App.D.C. 171, 175, 398 F.2d 765, 769 (1968).

29. Paul v. United States, 371 U.S. 245, 255, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed 10 (1947); G. L. Christian and Assoc. v. United States, 312 F.2d 418, 160 Ct.Cl. 1; 320 F.2d 345, 160 Ct.Cl. 58, cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); Farmer v. Philadelphia Electric Co., 329 F.2d 3, 7 and cases cited (3rd Cir. 1964).

30. ASPR 2.404–1(a); 32 C.F.R. 2–404–1 (January 1, 1971).

31. *Id.* at (b): Invitations for bids may be canceled after opening but prior to award where such action is consistent with paragraph (a) of this section, and the contracting officer determines in writing that:
 (1) Inadequate or ambiguous specifications were cited in the invitation;

 (2) Specifications have been revised;
 (3) The supplies or services being procured are no longer required;
 (4) The invitation did not provide for consideration of all factors of cost to the Government, such as cost of transporting Government-furnished property to bidders' plants;
 (5) Bids received indicate that the needs of the Government can be satisfied by a less expensive article differing from that on which the bids were invited;
 (6) All otherwise acceptable bids received are at unreasonable prices;
 (7) The bids were not independently arrived at in open competition, were collusive, or were submitted in bad faith (see § 1.111 of this subchapter for reports to be made to Department of Justice); or
 (8) For other reasons, cancellation is clearly in the best interest of the Government.

 Determinations to cancel invitations for bids shall state the reasons therefor.

ion by the contracting officer himself of the ambiguity in the provisions of the amended IFB. What initially led the contracting officer to recommend the award of the contract to Steinthal was his balancing of that ambiguity against what he discerned to be the prejudice to the respective parties resulting from a cancellation and readvertisement. It is beyond dispute, however, that the Statement was not an unequivocal assertion that the delivery schedule was a required schedule, as appellee Steinthal would have us believe and as the District Court found in its Memorandum Opinion.

Thereafter, when the contracting officer received the Comments from HQ, AFLC he found that it undermined two principal bases of his decision: (1) HQ, AFLC stated that open-ended delivery requirements defined only by a test of reasonable time, which was the predicate of Steinthal's bid and of the contracting officer's recommendation for approval of that bid, were not permitted under its interpretation of ASPR or under recent Comptroller General opinions. (2) HQ also highlighted the "conjecture" in his Statement regarding Pioneer's bid and his conclusion that Pioneer's bid would not have been lower even if it had used the "desired" delivery schedule interpretation followed by Steinthal. The contracting officer then reevaluated his Statement, in light of these remarks by a reviewing authority, and notified the parties of the cancellation and of the reasons therefor.

Under these circumstances, we consider the cancellation of bids to be in conformity with ASPR and, therefore, neither arbitrary nor capricious. And our conclusion stands firm even if it is assumed, for purposes of decision, that it is permissible for a contracting officer to take note of a bid ambiguity and to consider it offset by the prejudice that

he concluded would result to the parties from cancellation. However it certainly was reasonable for the contracting officer, after the Comments indicated that certain of his legal premises were erroneous and that his analysis of prejudice to Pioneer was speculative, to reconsider the significance of the ambiguity in the delivery schedule and to determine that, under the regulations, the ambiguous specifications warranted cancellation of the bids.[32]

II.

We have identified what we conclude was an error by the District Court in this case. But we think the particular error in this case is symptomatic of a more fundamental error in the approach of the District Court, in a misunderstanding and hence misapplication of the Scanwell opinion in which this court opened up the judicial forum for review of pre-procurement decisions of contracting officials which allegedly contravene either statutory limitations on the agency's authority or the agency's self-promulgated regulations. In subsequent decisions we have suggested the judicial responsibility to consider carefully and attentively the peculiar circumstances of each case, with a view towards limiting the instances of unnecessary judicial intervention into the procurement process.[33] However, it is appropriate at this juncture to undertake a more specific delineation of the relevant considerations for taking account of this strong public interest in avoiding disruptions in procurement, and for withholding judicial interjection unless it clearly appears that the case calls for an assertion of an overriding public interest "in having agencies follow the regulations which control government contracting." Scanwell Laboratories, Inc. v. Shaffer, supra note 1, 137 U.S.App.D.C. at 376, 424 F.2d at 864.

32. ASPR 2.404–1(b) (1); 32 C.F.R. § 2.404–1(b) (1) (Jan. 1, 1971).

33. Blackhawk Heating and Plumbing Co. v. Driver, 140 U.S.App.D.C. 31, 35, 433 F.2d 1137, 1141 (1970); Page Communi-

cations Engineers v. Resor, supra n. 27; A. G. Schoonmaker Co., Inc., et al. v. Resor, 144 U.S.App.D.C. 250, 445 F.2d 726 (decided March 5, 1971), modified by opinion of June 23, 1971.

The need for this undertaking is underscored by our experience with the manner in which cases after *Scanwell* have entered the judicial arena. After the agency has reached a decision, the losing bidder has rushed into court seeking to halt the particular procurement and to obtain an immediate judicial reconsideration of the agency's determination. The court is at one and the same time confronted with a number of technical procurement statutes and regulations, contract provisions and specifications, and asked to determine expeditiously whether the procurement should proceed.

■ With this background of the nature of procurement litigation in mind, we focus on two interrelated principles which we deem of especial importance for judicial consideration of emergency challenges to determinations of procurement officials: (1) courts should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision; and (2) even in instances where such a determination is made, there is room for sound judicial discretion, in the presence of overriding public interest considerations, to refuse to entertain declaratory or injunctive actions in a pre-procurement context.

In opening the courthouse doors to challenges of procurement determinations, *Scanwell* provided protection against illegal governmental action. This was salutory not only for the relatively few cases that might result in court intervention, but also for the greater number of cases which would be handled with greater care and more diligence within the government because of the awareness of the availability of judicial scrutiny. However, *Scanwell* and its progeny impose a concomitant responsibility upon the courts to study these cases attentively and to exercise with restraint the power to enjoin a procurement program. The court is obligated to restrict its inquiry to a determination of whether the procurement agency's decision had a reasonable basis.[34] This inquiry must fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations. Such discretion extends not only to the evaluation of bids submitted in response to a solicitation but also to determination by the agency with respect to the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements. The soundess of this approach is underscored by the special terminology and doctrines that have evolved in ASPR, and what might fairly be called the "common law of government procurement"[35]—a body of rulings and determinations emanating from executive officials and the uniquely situated Comptroller General,[36] quasi-judicial boards,[37] and courts.[38] If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.[39] Otherwise, the courts would be-

---

34. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 207, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947); Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Pancoastal Petroleum Ltd. v. Udall, 121 U.S.App. D.C. 193, 195, 348 F.2d 805, 807 (1965):

35. See generally, R. Nash and J. Cibinic, Federal Procurement Law (1966 ed.).

36. See *e. g.*, Cibinic and Lasken, The Comptroller General and Government Contracts, *supra* note 26.

37. *E. g.*, The boards of contract appeals in the various procurement agencies.

38. Most notably, the United States Supreme Court and the United States Court of Claims.

39. Udall v. Washington, Virginia and Maryland Coach Company Inc., 130 U.S. App.D.C. 171, 175, 398 F.2d 765, 769

come the forum for all manner of objections to procurement decisions—objections that counsel can readily relate to the language of some provision or other in some procurement regulation—and would be propelled without adequate preparation into a tangle of complex statutory and decisional rules. The sometimes esoteric nature of this inquiry is exemplified by the references in the footnote to the contentions made in the case before us including, e. g., the significance of the use of capital letters for key words rather than ordinary print.[40]

■ The judicial discretion to decline to entertain actions seeking declaratory or injunctive relief, on the grounds of equitable considerations or of concepts of the "public interest," may also be involved.[41] The availability of a damages remedy in the Court of Claims, which in many cases will compensate the frustrated bidder's realized financial losses (i. e., the bid preparation costs) resulting from the illegal agency action, provides a sound equitable basis for the exercise of this discretion in considering whether to entertain a suit for injunctive relief.[42] We are not referring solely to the public interest in the smooth flow and expeditious completion of the procurement process,[43] but more specifically to the additional public interest consideration that obtains when what is involved is an item like parachutes and a short delivery schedule. This kind of urgent matter should not arise often, but when it does arise there is discretion in the District Court to decline to consider the prayer for injunctive or declaratory relief, and to leave the bidder solely to his damages remedy. To avoid any confusion, it is not being stated here that the damages available to the disappointed bidder, which do not comprehend anticipated profit, are automatically an "adequate" legal remedy as to warrant dismissal for want of equity of every injunction action regardless of the strength of plaintiff's claim on the merits. Gould Inc. and Eltra Corp. v. Cha-

(1968); Duesing v. Udall, 121 U.S.App. D.C. 370, 374, 350 F.2d 748, 752 (1965), cert. denied, 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966).

40. For example, the parties in their instant action devoted a portion of their argument on appeal to whether the amended IFB conformed with ASPR regulations suggesting the appropriate phrasing for "required" and "desired" delivery schedules. ASPR 1.305–4; 32 C. F.R. 1.305–4 (Jan. 1, 1971). In the District Court Steinthal contended that the use of the word "DESIRED" in the IFB rather than the word "REQUIRED" to describe the delivery date clearly expressed the Government's intention to allow Steinthal to suggest a reasonable delivery date. Pioneer contends on appeal, however, that the use of the terms "DESIRED" and "REQUIRED" is permissive, not mandatory (ASPR § 1.305–4 (a)), that the regulations require that the word "DESIRED" be in full capitals when a desired delivery date is to be expressed, and that the use of the "DESIRED" delivery schedule also requires, according to decisions of the Comptroller General, the inclusion of a maximum acceptable date for delivery.

A court's interpretation of language in an action on a contract normally involves consideration of the ordinary meaning of the words in the context of the particular document. Sometimes there is technical language, and there must be technical witnesses. In the instant case the District Court was faced with contentions about the language in the IFB which were dependent, in part, upon underlying Government regulations which were being administered daily by Government agencies, and which had content provided by the practice of those agencies in applying the regulation.

41. Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937); Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Davis v. Ichord, 143 U.S.App. D.C. 183, 192, 442 F.2d 1207, 1216 (1970) (concurring opinion).

42. Keco Industries Inc. v. United States, 428 F.2d 1233, 1240, 192 Ct.Cl. 773, 784–785 (1970); Robert F. Simmons and Associates v. United States, 360 F.2d 962, 175 Ct.Cl. 510 (1966); Heyer Products Co. v. United States, 140 F. Supp. 409, 135 Ct.Cl. 63 (1956); 177 F.Supp. 251, 147 Ct.Cl. 256 (1959).

43. See, e. g., Page Communications Engineers v. Resor, supra note 27 at 3.

fee, 146 U.S.App.D.C. 206, 450 F.2d 667 (decided June 30, 1971); John Reiner & Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381 (1963). But as appears from settled precedent, *supra* note 41, there is discretion under doctrines of public interest to withhold relief even assuming the private bidder cannot be made completely whole in damages.

 It would be intolerable for any frustrated bidder "to render uncertain for a prolonged period of time government contracts which are vital to the functions performed by the sovereign." Blackhawk Heating and Plumbing Co. v. Driver, *supra* note 33, 140 U.S.App.D.C. 31, 433 F.2d at 1141. The frivolous lawsuit can, of course, be terminated swiftly by the summary judgment procedure in the Federal Rules of Civil Procedure. *Id.* However, even assuming a colorable claim by the disappointed bidder, it does not follow that he is entitled to an evidentiary hearing and judicial determination of the merits of his claim before termination of the procurement process. Procurement agencies are required to decide many close and complex questions. Only when the court concludes that there has been a clear violation of duty by the procurement officials should it intervene in the procurement process and proceed to a determination of the controversy on the merits. This principle, as applied in the procurement field, would be an updated analogue of the traditional doctrine that mandamus should be issued to compel performance only when there has been a clear violation of an official duty of what has come to be labeled a "ministerial" duty,[44] a duty not involving any room for discretion.

In the more relaxed context of an action for damages, the court has an effective opportunity to give careful consideration to the controversy at hand, to probe the various and interrelated provisions of regulations, contract terms and specifications, questioning technical witnesses if necessary, reviewing pertinent administrative procedures and practices that give content as well as background to generalized regulations.

But when the court is thrust into the vortex of emergency litigation in which bidders are seeking immediate, injunctive relief, and all parties are seeking expedited determination, it is difficult in the time available for the court to become steeped in the pertinent learning. Consequently, courts should be reluctant to intervene absent a clear showing of illegality by the party attempting to overturn the agency determination.[45]

The present case is an apt illustration of the problems created by precipitate judicial involvement in the procurement process. The District Court, in effect, acted upon its own view of whether there was an ambiguity in the Government's invitation for bids. If the Government had contracted with either Steinthal or Pioneer and a dispute had arisen over the meaning of the delivery schedule, the court would have been faced with a familiar judicial problem of contractual interpretation; it might decide that, regardless of the intention of the Government's draftsman, the amended IFB gave the contractor reasonable latitude as to the time of delivery. Such a decision might very well be upheld by this court since it involves the resolution of a contractual ambiguity, and under familiar legal doctrine a court may well construe a provision strictly against the Government draftsman, giving the benefit of any doubt to the private party who did not draft the particular provision.

The problem in the instant case, however, was totally different and clearly unfamiliar to the judicial process of conflict resolution. From the viewpoint of the procurement program, the contracting officials were not faced with the is-

44. Panama Canal Co. v. Grace Line, Inc. 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809 (1930).

45. *Cf.* Wilbur v. United States ex rel Kadrie, *supra* note 44.

sue of how the ambiguity should be resolved but rather with the question of whether there was an ambiguity which resulted in an inequality among the bidders and warranted readvertisement. The balancing of the public interest in free and fair competitive bidding against both the fairness to the parties and the Government's contractual needs requires informed judgments by officials continuously faced with such decisions, not by the courts which are unfamiliar with, and ill-equipped to handle, problems couched in these procurement policy terms. (See note 40, *supra*.)

■ There are several other factors relevant to the consideration of Government procurement cases which serve to illuminate the principles of judicial restraint articulated above. We have noted that the denial of injunctive relief may mean that a bidder in fact deprived of legal rights cannot obtain recovery for loss of anticipated profits. Although this is, of course, a possibility, it is not one so poignant or painful as it might initially appear to those schooled in private contract controversies. A fundamental difference between government procurement and private contract litigation is evidenced by the clause, standard and required in government contracts, whereby the government reserves the right, even in the case of a duly executed contract, to terminate the contract "for the convenience of the government." Even if this clause is omitted from a particular contract it will be incorporated into the contract by operation of law since it is required by ASPR and this requirement has the force and effect of law. G. L. Christian and Assoc. v. United States, 312 F.2d 418, 160 Ct.Cl. 1; 320 F.2d 345, 160 Ct.Cl. 58, cert. denied 375 U.S. 954, 84 S.Ct. 444, 11 L. Ed.2d 314 (1963). The termination-for-convenience clause "lodge[s] in the contracting officer the fullest of discretion to end the work 'in the best interests of the Government.'" Nolan Bros., Inc. v.

United States, 405 F.2d 1250, 1253, 186 Ct.Cl. 602, 606, (1969). On the basis of the contracting officer's wide, though not completely unbridled, discretion under this clause to terminate a contract for the best interests of the Government, the courts have denied the contractor recovery for anticipated profits. See *Nolan Bros., Inc., id.* and cases cited therein. Indeed there may be "adequate cause" for termination, asserted as a defense to a breach action, even though it may not have been known at the time the action was taken by the Government's contracting officer. College Point Boat Corp. v. United States, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925).

Another element in the controversy at bar that merits careful attention is the importance in Government procurement of the position of the General Accounting Office.

■ A court's reluctance to interfere with the executive procurement process should be especially strong where, as here, the General Accounting Office has made a determination upholding the procurement officials on the merits. The Court of Claims—a constitutional court whose special expertise in the field of government contracts guides us as a matter of strongest comity, if not requirement [46] —voiced the stature of the GAO in the procurement area in these terms in its *Reiner* opinion: [47]

Here, termination would have been invoked in deference to the Comptroller General's declaration that the contract should be cancelled. The contracting officer did not agree with that opinion, but it is the usual policy, if not the obligation, of the procuring departments to accommodate themselves to positions formally taken by the General Accounting Office with respect to competitive bidding. That Office, as we have pointed out, has special concern with, and supervision over, that aspect of procurement. It would be en-

46. Industrial Bank of Washington v. United States, 138 U.S.App.D.C. 19, 21, 23, 424 F.2d 932, 934 (1970).

47. John Reiner and Co. v. United States, 325 F.2d 438, 442, 163 Ct.Cl. 381, 390–391 (1963).

tirely justifiable for the contracting officer to follow the general policy of acceding to the views of the Accounting Office in this area even though he had another position on the particular issue of legality or propriety. He would not be allowing the Comptroller General to dictate the termination of the contract but, rather, would be using termination as a means of minimizing a conflict with another arm of Government properly concerned with the contractual problem. It cannot be contrary to "the best interests of the Government"—the controlling standard of the termination clause—to end a contract which the Comptroller General has branded as incorrectly advertised.

Recently this court, citing *Reiner*, reaffirmed this analysis in Schoonmaker v. Resor.[48] In that case we upheld the Defense Department's action rejecting bids for generator sets, even assuming that that department had reversed its initial procurement determination solely to eliminate a difference of opinion with the General Accounting Office which had held the invitation ambiguous. In reversing an injunction requiring that the contract be awarded to the low bidder, we noted that the District Court had failed to examine the findings of the Comptroller General. On our examination we concluded that the Comptroller General, who was mindful that generally the integrity of the bidding system may be impaired unless contracts are awarded to the lowest responsible bidder, was not arbitrary or capricious in concluding that, in the particular case, the invitations were ambiguous and failed to provide clear and objective instructions, and that the dominant public interest lay in requiring that the bidding instructions be such as to insure free and fair competition.

Finally, in pointing out that in a suit by a disappointed bidder under *Scanwell* to enjoin the action of a contracting officer, the court may properly take into account the concurrence of the General Accounting Office we think it appropriate to observe that the GAO is an arm of the legislature which is independent of the executive branch, and has an accumulated experience and expertise attested to by a substantial volume of bid protest cases filed and decided, a volume that has been increasing markedly in recent years.[49]

The significance of the GAO's review procedure is discussed in Wheelabrator Corp. v. Chafee, Nos. 24705 and 24729, 147 U.S.App.D.C. ——, 455 F.2d 1306, decided this day, and as is noted therein may warrant the court's exercise of its jurisdiction to issue a preliminary injunction by means of an order limited in duration to the time needed for GAO disposition of a pending protest.

The GAO's decision is not necessarily dispositive, however, and we take occasion to point out that there certainly may be instances where the District Court will find procurement illegality that the GAO failed to recognize, or at any event failed to correct.

We do not recede from our expression in *Scanwell* of the beneficial purposes served by frustrated bidders who, as "private attorney generals," can aid in furthering the public interest in the integrity of the procurement process. The courts are properly concerned that the procurement activities of the Government be carried out in accordance with the applicable statutes and agency regulations and that these governmental functions not be permitted to deteriorate into actions reflecting personal predelictions of administrative officials, whether ascribable to whim, misplaced zeal, or imper-

---

48. Nos. 24,706 and 24,708, opinion of June 23, 1971, modifying opinion of March 5, 1971.

49. The data are presented in Wheelabrator Corp. v. Chafee, decided this day.

missible influence.[50] However the public interest in a Government procurement process that proceeds with expedition is likewise of importance. The court must refrain from judicial intervention into the procurement process unless the actions of the executive officials are without any rational basis.

Reversed.

TAMM, Circuit Judge, dissents.

50. The application of the rule of law to government procurement is an extension of trends established before *Scanwell* and is responsive to the increasing significance of government procurement in the economic life of our citizens. *See,* Leventhal, Public Contracts and Administrative Law, 52 A.B.A.J. 35 (1966).