**MULTIPLE USE, INC., Plaintiff,**

**v.**

**Rogers C. B. MORTON, Secretary of the Department of the Interior of the United States of America, Defendant.**

**Civ. No. 71–211–PCT–WCF.**

United States District Court,
D. Arizona,
Prescott Division.

Nov. 9, 1972.

Hale C. Tognioni, Phoenix, Ariz., for plaintiff.

William C. Smitherman, U. S. Atty., Tucson, Ariz., Alice A. Wright, Asst. U. S. Atty., Phoenix, Ariz., for defendant.

## OPINION AND ORDER

FREY, District Judge.

The matter is before the court on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff's complaint alleges jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1361 and 1391(e), and seeks relief from the administrative decision of the Secretary of the Interior in that the Robe Roye-Martin-Missing Link placer mining claim is alleged to be null and void for lack of discovery of a valuable mineral deposit. United States v. Silverton Mining and Milling Co., IBLA 70–22 (1970). The

scope of this court's review, as discussed below, will be to determine if the Secretary's decision is supported by the record as a whole.

Plaintiff (now Multiple Use, Inc., but originally (1) Silverton Mining and Milling Co. and (2) Minerals Technology) contends in its motion:

1. That a discovery of valuable mineral had been made upon the Robe Roye-Martin-Missing Link placer claim, and that said discovery still existed at the time of the hearing;

2. That it is legally entitled to all 103.18 acres included in its patent application.

In its motion defendant contends that:

1. The true test for a discovery of a valuable mineral deposit in accordance with the applicable mining laws was applied in the various proceedings below;

2. There is substantial evidence in the record to support the Secretary's decision that there was not a discovery of valuable mineral deposit;

3. In view of the Secretary's holding that there was no discovery on any part of the amended claim and consequently that the size of the location to be considered for patent was irrelevant, there was no need to determine whether the claim was valid for 20 or 103.18 acres.

## FACTUAL HISTORY

The factual history shows that the claim, located within the Prescott National Forest, was originally located as three separate claims. The Robe Roye, covering 20 acres, was located in 1896 by J. M. Green. The Martin claim also covered 20 acres and was located in 1915 by Sam Boblett. In 1933, A. B. Peach and Ziba O. Brown located the approximately 40-acre Missing Link claim. By mesne conveyances E. J. and Pearl Schreck, in 1949, acquired a partial interest in each of the claims. In 1957, the Schrecks brought a quiet title action which established them as "the owners of the whole interest in fee simple" of these three and other mining claims. In 1962, the Schrecks filed a "Notice of Mining Location Amended" which combined the three claims into an association placer claim of 160 acres. The notice named the locators of the three claims and added those of Dorothy O. Peach, Ida H. Brown, and the Schrecks. It also said that the interest of all locators had been quieted in the Schrecks in 1957. On October 13, 1962, the claim, as amended, was conveyed to Dale Moran, who with Sally Moran conveyed it on October 31, 1963, to the Silverton Mining and Milling Co., Inc. On September 23, 1964, Silverton filed an amended location notice in the same form as the first one but reducing the acreage to 103.18 acres.

Silverton then filed an application October 6, 1964, to patent Arizona 034305, the Robe Roye-Martin-Missing Link placer mining claim constituting 103.18 acres, alleging that the claim contained a valuable mineral deposit of placer gold, building stone, sand and gravel. In protest to the patent application, a contest complaint was initiated on behalf of the Forest Service, United States Department of Agriculture, February 1, 1966, alleging, inter alia, that a valid discovery of mineral as required by the mining laws of the United States did not exist within the limits of the claim, and that the present claimant was entitled to only a 20 acre claim rather than 103.18 acres. An evidentiary hearing was held in Prescott, Arizona, December 12, 1966, under a Department of Interior Bureau of Land Management hearing examiner in which the issues were resolved to those substantially as presented above in plaintiff's motion, i. e.:

1. Whether the claim contains acreage in excess of that allowed by the mining laws.

2. Whether there is a mineral deposit of sufficient value on the claim to meet the requirements of the mining laws.

First, taking up the acreage issue, the Hearing Examiner's decision of June 2, 1967, held that the claim could be valid for at most 40 acres, any excess thereof

being void.[1] However, he further concluded that the gold values remaining in the placer material in the claim no longer constituted a valuable mineral deposit.[2] The examiner also found that non-metallic sand, gravel and stone on the claim were common varieties and these materials were not valuable within the meaning of the mining laws prior to the act of July 23, 1955.[3] The examiner therefore declared the Robe Roye-Martin-Missing Link placer mining claim null and void for lack of a valuable mineral deposit.

Contestee (plaintiff) appealed to the Bureau of Land Management[4] which, by decision of December 4, 1968, pointed out that a claim could be valid only for the acreage properly within it at the time of discovery. Thus, if there had been no discovery up to the time of transfer of the claim to the contestee, contestee (as an individual) could hold only 20 acres within a single claim under 30 U.S.C. § 35. Affirming the Hearing Examiner's decision, it then concluded that none of the land within the 103.18 acres had been shown to contain a discovery of a valuable mineral deposit which would satisfy the test for discovery.

Contestee thereafter appealed to the Secretary of Interior in accordance with the provisions of 43 C.F.R. Part 1840. On September 23, 1970, the Board of Land Appeals, under authority delegated by the Secretary of Interior, affirmed the Bureau of Land Management's holding that the areal extent of a claim depends upon its ownership at the time of discovery; that there was no discovery in any part of the amended claim; and that, in view of this holding, there was no need to determine whether or not the claim was valid for 20 or 103.18 acres, stating: "If there is now no discovery sufficient to validate the claim, then it does not matter what area the locator says the claim covers for the claim is invalid whatever its extent."[5]

Thereafter, as previously noted, plaintiff filed a complaint in this court under the Administrative Procedure Act alleging that the Secretary's decision should not be sustained because:

1. It was arbitrary, capricious, and not in accordance with law in that the record discloses no reliable, probative, or substantial evidence in support of the conclusion that there was not a discovery of a valuable mineral deposit within the boundaries of the claims in question.

2. The administrative decisions were erroneous and not in accordance with the law of discovery in that they are based on the Department of Interior's test of discovery which requires proof that the mining claimant will in fact develop a profitable mine, and which exceeds the true test of a discovery of a valuable mineral deposit which merely requires that minerals be found of sufficient quality and quantity to justify a person of ordinary prudence in the further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine.

3. There is not substantial evidence in the record to support the Board of Land Appeals' decision which affirms the Hearing Examiner's decision that all but 40 acres of the Robe Roye-Martin-Missing Link placer mining claim is void because of being in excess of the acreage allowed by the mining laws. This decision is also contrary to law.

## SCOPE OF JUDICIAL REVIEW

Although plaintiff's complaint alleged that jurisdiction is conferred by both the Administrative Procedure Act (*supra*) and 28 U.S.C. § 1361 (and § 1391(e)), plaintiff's memorandum in

---

1. 30 U.S.C. §§ 23, 35, 36 (1964).

2. 30 U.S.C. §§ 23, 29 (1964).

3. 30 U.S.C. § 611 (1964).

4. Branch of Mineral Appeals, Office of Appeals and Hearings.

5. IBLA 70–22 at 18, citing U. S. v. Melluzo, 70 ID 160 (1969), and U. S. v. Estate of Alvis F. Denison, 76 ID 233 (1969).

support of its motion argues for jurisdiction solely on the basis of the Act. However, the scope of the court's review in this case would not substantially differ whether conducted under the Act or 28 U.S.C. § 1361, action for mandamus. The standard for judicial review was clearly stated in Sanford v. United States, 399 F.2d 693, 694 (9th Cir. 1968), where the Court held:

"No judicial relief from action of the Army Board for Correction of Military Records is available in the absence of a showing that the action was arbitrary or capricious or was unsupported by substantial evidence. The lower court reviewed all documentary evidence submitted by appellant and concluded that appellant had not met his burden of establishing that the Board had acted arbitrarily and that there was substantial evidence to support the Board's decision. We agree" (citations omitted).

■ The general application of this standard is well supported and has been almost uniformly construed where the review involves the expertise of an administrative agency; i. e., judicial relief is not available unless the administrative action was arbitrary and capricious and unsupported by substantial evidence. As stated by the Supreme Court in Cameron v. United States, 252 U.S. 450, 464, 40 S.Ct. 410, 414, 64 L.Ed. 659 (1920):

"Whether the tract covered by Cameron's location was mineral and whether there had been the requisite discovery were questions of fact, the decision of which by the Secretary of the Interior was conclusive in the absence of fraud or imposition, and none was claimed" (citations omitted).

■■ The scope of judicial review in actions such as this has always been confined to the administrative record. Morgan v. Udall, 306 F.2d 799, 801, cert. denied, 371 U.S. 941, 83 S.Ct. 320, 9 L. Ed.2d 275, 113 U.S.App.D.C. 192 (1962). The plaintiff is only entitled to a determination of whether there was support in the administrative record for the Secretary's findings of fact. A judicial determination of whether a finding of fact is supported by the evidence presents only an issue of law. If on the record there is "substantial evidence to support the Secretary's decision, that decision must be affirmed". Henrikson v. Udall, 350 F.2d 949, 950 (9th Cir. 1965); Dredge Corporation v. Penny, 338 F.2d 456, 462 (9th Cir. 1964); White v. Udall, 404 F.2d 334, 335 (9th Cir. 1968). A court "cannot, pursuant to its mandamus jurisdiction, direct exercise of a judgment or discretion in a particular way", Casarino v. United States, 431 F. 2d 775 (2d Cir. 1970).

■■ Moreover, the court "looks to the expertise of the Department of the Interior, which has plenary authority over the administration of public lands, including mineral lands". Henrikson v. Udall, 229 F.Supp. 510, 512 (N.D.Cal. 1964). And, even though a court in a trial de novo might have arrived at a different result, it may not substitute its judgment for that of the administrative agency expert in the field. Ickes v. Underwood, 78 U.S.App.D.C. 396, 141 F.2d 546, 548, cert. denied, 323 U.S. 713, 65 S.Ct. 39, 89 L.Ed. 574 (1944); Hayes v. Seaton, 106 U.S.App.D.C. 126, 270 F. 2d 319, 321 (1959), cert. denied, 364 U. S. 814, 81 S.Ct. 40, 5 L.Ed.2d 46 (1960). The standard was reiterated clearly in Port of New York Authority v. Federal Maritime Commission, 429 F.2d 663, 666 (5 Cir. 1970), cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971), where it was held that on appeal from determination of an administrative agency, the court must "consider whether the order in question is supported by substantial evidence", and that the court is not to "review the matter de novo nor are we to substitute our discretion for that of the [agency.]"

■ The fact that reasonable people may differ and "on the same evidence a reviewing court could have reached a decision contrary to that reached by the agency will not support a determination that the administrative action was arbitrary and capricious". Carlisle Paper

Box v. NLRB, 398 F.2d 1 (3 Cir. 1968), citing NLRB v. Jas. H. Matthews and Co., Industrial Mark. Prod. Div., 342 F.2d 129, cert. denied, 382 U.S. 832, 86 S.Ct. 74, 15 L.Ed.2d 76 (3 Cir. 1965). This does not mean that there is no evidence on the other side, but only that there must have been enough evidence supporting the Secretary's decision to justify, if it were a jury trial, a refusal to direct a verdict against him. Consolo v. Federal Maritime Commission, 383 U.S. 607, 618–621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

The same point was emphasized later by the Court of Appeals for the District of Columbia when it said:

"A court has no warrant to set aside agency action as arbitrary or capricious when those words mean no more than that the judges would have handled the matter differently had they been agency members. Judicial intervention must, instead, be rested upon a demonstration that the agency action has transgressed the statutory boundaries, either because it is beyond the scope of statutory authority or because the findings underlying it lack significant support in the record." U. S. A. Conference v. Federal Maritime Commission, 130 U.S.App.D.C. 261, 399 F.2d 994, 997 (1968).

The standard for judicial review noted in *Sanford* (*supra*) was summarized in Halsey v. Nitze, 390 F.2d 142, 144, cert. denied, 392 U.S. 939, 83 S.Ct. 2316, 20 L.Ed.2d 1399 (4 Cir. 1968), where the court unanimously held:

"Under the uniform holdings of the various United States courts we are not authorized to reverse the action of the agency and the appellate commission unless their decisions are arbitrary, unreasonable, capricious, or not supported by substantial evidence. . . . The scope of judicial review by us and by the district court was fully exhausted when the record disclosed substantiality in the support for the administrative findings, so that summary judgment was indicated"

The Court of Appeals for the Ninth Circuit applied the standard again in 1971 in Moseley v. Hickel, concisely saying:

The standard which has been recently applied by the Ninth Circuit Court of Appeals can be stated concisely. Since the decision of the Secretary in this case was supported by substantial evidence, summary judgment should be entered for the Government. Moseley v. Hickel, 442 F.2d 1030 (9th Cir., 1971); Henrikson v. Udall, 350 F.2d 949 (9th Cir., 1965).

This court has reviewed the entire documentary record of this case, including the transcript of the proceedings and decision of the Hearing Examiner and the appellate decisions of the Bureau of Land Management and Board of Land Appeals of the Department of Interior, in light of the standard for judicial review enumerated above. In view of our decision with respect to the issue of discovery, as discussed below, we find it unnecessary to reach the contingent issue as to the number of acres to which plaintiff may be entitled. The following constitute the court's findings and conclusions.

## OPINION AND ORDER

In its motion plaintiff alleges that the Secretary applied an improper test for discovery, and "that a discovery of valuable minerals has been made upon the Robe Roye-Martin-Missing Link placer claim, and that said discovery still existed at the time of the hearing."

■■ Under the mining laws of the United States, "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase . . ." 30 U.S.C. § 22. A mining claim on public lands of the United States is initiated by location. The location of a mining claim gives the locator certain rights against rival mining claimants, but as against the United States the locator of a mining claim on the public domain has only "taken the initial steps in

seeking to secure a gratuity from the Government." Ickes v. Underwood, *supra*. The locator obtains no rights against the United States until there has been a discovery of a valuable mineral deposit within the limits of the claim. 30 U.S.C. § 23; Best v. Humboldt Placer Mining Co., 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); Cameron v. United States, 252 U.S. 450, 40 S.Ct. 410, 64 L. Ed. 659 (1920); Cole v. Ralph, 252 U.S. 286, 296, 40 S.Ct. 321, 64 L.Ed. 567 (1920). Congress has left implementation of this standard to the Executive and to the Courts. Converse v. Udall, 399 F.2d 616, 619 (9th Cir. 1968).

In 1905, the Supreme Court in Chrisman v. Miller, 197 U.S. 313, 322, 25 S. Ct. 468, 49 L.Ed. 770, approved and adopted the "prudent man" test as developed by the Department of Interior and stated by it in Castle v. Womble, 19 L.D. 455, 457 (1894) as follows:

"Where minerals have been found and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the requirements of the statute have been met."

This test has been approved by the United States Supreme Court on numerous occasions; e. g., Cole v. Ralph, *supra*; Best v. Humboldt Placer Mining Co., *supra*; United States v. Coleman, 390 U.S. 599, 602, 88 S.Ct. 1327, 20 L. Ed.2d 170 (1968). Moreover, this standard has been repeatedly applied by the Court of Appeals for the Ninth Circuit.[6]

▉ In 1968, in *Coleman, supra*, the United States Supreme Court discussed the standard of Castle v. Womble. The Court unanimously approved, as complementary to its prudent-man test, the so-called "marketability" test under which in order to qualify as "valuable

mineral deposits" under 30 U.S.C. § 23, it must be shown that the mineral can be "extracted, removed, and marketed at a profit." *Coleman* at 600, 88 S.Ct. at 1329. This test is applicable to all minerals. Converse v. Udall, *supra*, 399 F. 2d at 621. The "marketability" and "prudent man" tests are not distinct standards, but rather are complementary in that the former is a refinement of the latter:

"Under the mining laws Congress has made public lands available to people for the purpose of mining valuable mineral deposits and not for other purposes. The obvious intent was to reward and encourage the discovery of minerals that are valuable in an economic sense. Minerals which no prudent man will extract because there is no demand for them at a price higher than the cost of extraction and transportation are hardly economically valuable. Thus, profitability is an important consideration in applying the prudent-man test, and the marketability test which the Secretary has used here merely recognizes this fact." *Coleman* 390 U.S. at 602–603, 88 S.Ct. at 1330.

▉ A discovery of a valuable mineral deposit has therefore been made when a mineral deposit has been found and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means with a reasonable prospect of success in developing a mine. In determining whether a mineral deposit is valuable, the Secretary may require a showing that there is a reasonable expectation based upon the circumstances known at that time that the mineral can be extracted, removed and marketed at a profit. *Coleman, supra*. It need not be proved that the claim can in fact be operated at a profit, but the evidence as to costs of mining may be considered in determining

---

6. See Lange v. Robinson, 148 F. 799 (9th Cir. 1906); Charlton v. Kelly, 156 F. 433, 436 (9th Cir. 1907); Adams v. United States, 318 F.2d 861, 870 (9th Cir. 1963).

whether a person of ordinary prudence would be justified in the further investment of labor and capital. Converse v. Udall, *supra*.

7. IBLA 70–22 at 19:
"The test for a discovery of a valuable mineral deposit under the mining law has often been stated. A discovery has been made when a mineral deposit has been found and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine. United States v. Coleman, 390 U.S. 599 [88 S.Ct. 1327, 20 L.Ed.2d 170] (1968). In determining whether a mineral deposit is valuable, the Secretary may require a showing that there is a reasonable expectation based upon the circumstances known at the time that the mineral can be extracted, removed, and marketed at a profit—that is that it is marketable at a profit, United States v. Coleman, supra; Converse v. Udall, 399 F.2d 616 (9th Cir. 1968); United States v. Jenkins, 75 I.D. 312, 318 (1968). It need not be proved that the claim can in fact be operated at a profit, but the evidence as to the costs of mining may be considered in determining whether a person of ordinary prudence would be justified in the further investment of labor and capital. Converse v. Udall, supra; United States v. New Jersey Zinc Company, 74 I.D. 191 (1967)."
Decision, Bureau of Land Management, at 11:
"The prudent man test, first enunciated in 1894 and since then frequently repeated both by the Department and by the Courts with approbation, is simply stated:
where minerals have been found and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success in developing a valuable mine, the requirements of the statute have been met. Castle v. Womble, 19 L.D. 455, 457 (1894); Chrisman v. Miller, 197 U.S. 313, 322 [25 S.Ct. 468, 49 L.Ed. 770] (1905); Best v. Humboldt Placer Mining Company, 371 U.S. 334, 335 [83 S.Ct. 379, 9 L.Ed.2d 350] (1963).
The marketability test is similarly stated in simple language in Foster v. Seaton, 106 U.S.App.D.C. 253, 271 F.2d 836 (1959):
. . . . [a] mineral locator or applicant, to justify his possession, must show

The foregoing tests and application thereof are essentially the same as those employed by the Department of the Interior in the hearing and appeals below.[7]

that by reason of accessibility, *bona fides* in development, proximity to market, *existence of present demand*, and other factors, the deposit is of such value that it can be mined, removed and disposed of at a profit. 271 F.2d 836, at 838, citing Layman v. Ellis, 54 I.D. 294, 296 (1933) emphasis supplied in Foster v. Seaton.
Recently, the United States Supreme Court in United States v. Coleman, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968), again reaffirmed the prudent man test for discovery and expressly approved the marketability test as an "admirable effort to identify with greater precision and objectivity the factors relevant to a determination that a mineral deposit is 'valuable'." 390 U.S. at 602, 88 S.Ct. at 1330.
Although *Coleman* arose from a case involving nonmetallic minerals of widespread occurrence, the United States Court of Appeals for the Ninth Circuit conclusively rejected the notion that the marketability test applies only to such nonmetallics. In Converse v. Udall, 399 F.2d 616 (9 Cir. 1968), the Court, after quoting at length from *Coleman*, said:
We think it clear that the marketability test is applicable to all mining claims. 399 F.2d at 621.
Decision, Hearing Examiner Graydon E. Holt, at 10:
"The requirements for a discovery of valuable minerals under the mining laws are set forth in the "prudent man" test, Castle v. Womble, 19 L.D. 455 (1894), approved in Chrisman v. Miller, 197 U.S. 313 [25 S.Ct. 468, 49 L.Ed. 770] (1905), and recently reaffirmed in Best v. Humboldt Placer Mining Company, 371 U.S. 334, [83 S.Ct. 379, 9 L.Ed.2d 350] (1963). This rule is that:
"Where minerals have been found and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the requirements of the statute have been met.""
And in the determination of' whether a non-metallic mineral of wide occurrence is valuable under the mining laws, the Department and the courts have stressed the additional requirement of marketability and have held that the locator must show that the deposit is of such value that it can be mined, removed and disposed of at

The test does not require, as alleged by the plaintiff in his complaint, that a mining claimant prove that he will, in fact, develop a profitable mine. The test merely allows the cost of extraction, transportation, and marketing to be taken into consideration in determining whether a person of ordinary prudence would be justified in the further expenditure of his labor and means. This court therefore concludes that the Secretary correctly applied the true test for a discovery of a valuable mineral deposit; and it was in accord with the applicable mining laws and recent decisions, including Verrue v. United States, 457 F.2d 1202 (9th Cir. 1972).

■■■ The next question is whether there is substantial evidence in the record to support the Secretary's decision that there was no valid discovery.

The record discloses substantial documentary and testimonial evidence on the question of whether the gold, sand, gravel and stone located on the claim constituted a valuable mineral within the meaning of the mining laws.[8] With respect to the gold on the claim, the record contains historical evidence that gold was first discovered along Lynx Creek in 1863 and it became one of the most productive placer gold streams in the State of Arizona. The total value of gold production has been estimated at $2,000,000. The great bulk of this production was in the period prior to 1885 and during the period between 1932 and 1942. During this latter period there were apparently some eight to ten dredging operations along the creek, including one in the area covered by the claim in issue. Plaintiff contends on these bases that there "must have been a discovery of gold by original locators", and therefore plaintiff gained rights to the claim under 30 U.S.C. § 38 and is

entitled to all of the contested 103.18 acres. In support of this proposition plaintiff cites United States v. Ickes, 68 App.D.C. 39, 98 F.2d 271, cert. denied 305 U.S. 619, 59 S.Ct. 80, 83 L.Ed. 395 (1938), to the effect that any successor in interest acquires the rights of the original locators. In that case the court was concerned with the rights of placer mining claimants and transferees thereof prior to and post discovery, including rights to possession and protection against forcible, fraudulent, or clandestine intrusion, and construal of apparently contradictory statutory provisions as to the amount of acreage an individual could claim under the then current mining laws. The case involved an "admittedly valid discovery" (Id. at 273) made in 1927 when the mining laws ambiguously provided that:

"no location of a placer claim . . . shall exceed *one hundred and sixty acres for any one person* or association of persons", (Rev.Stat. § 2330 (1878), 30 U.S.C. § 36 (1934), 30 U.S.C.A. § 36.) and that "no such location shall include more than *twenty acres for each individual claimant* . . ." (Rev.Stat. § 2331 (1878), 30 U.S.C. § 35 (1934), 30 U.S.C.A. § 35) (emphasis added).

The issue framed by the court as the "sole, substantive question" was:

"Is the transferee of an association placer claim of more than 20 acres, who, after the transfer, makes a discovery, entitled to a patent to more than 20 acres immediately surrounding the discovery?" (ID at 273–74).

The issue was not one of valid discovery, and the case is inapposite for the proposition asserted by the plaintiff since here the Secretary found a lack of sufficient discovery on any of the acreage and consequently did not reach

---

a profit. Ickes v. Underwood, [78 U.S. App.D.C. 396,] 141 F.2d 546 (1944) ; United States v. Strauss, 59 I.D. 129 (1945) ; United States v. Foster, 65 I.D. 1 (1958) ; and Foster v. Seaton, [106 U.S.App.D.C. 253,] 271 F.2d 836, 838 (1959)."

8. The United States Attorney "Memorandum in Support of the Defendant's Motion for Summary Judgment" is replete with detailed, accurate references to specific evidence on this question.

the question of whether the claim was valid for 20 or for 103.18 acres.

Moreover, the general historical information adduced, showing earlier profitable ventures in the Lynx Creek area was not probative of discovery on the specific claim in question, as affirmed in the decisions below. More importantly, such historical discovery is irrelevant and would not be controlling in any event, since it must be shown that the claim is valuable as of the time of the application for patent as was brought out in Best v. Humboldt Placer Mining Co., 371 U.S. at 336, 83 S.Ct. at 382, wherein the Court stated:

"A locator who does not carry his claim to patent does not lose his mineral claim, though he does take the risk that his claim will no longer support the issuance of a patent. United States v. Houston, 66 L.D. 161, 165. It must be shown before a patent issues that at the time of the application for patent, 'the claim is valuable for minerals,' *worked-out claims not qualifying*" (emphasis added).

In Mulkern v. Hammitt, 326 F.2d 896, 897 (9th Cir. 1964), the court expounded on the rationale for this view, pointing out that public lands of the United States should not be perpetually encumbered and occupied by a private occupant who at one time may have had a valuable mine which has now been completely worked out. The *Mulkern* court cited their holding in Adams v. United States, 318 F.2d 861 (9th Cir. 1963), saying:

"[E]ven though the mining claim there in litigation would, at one time, have satisfied the test, nevertheless the Government rightfully denied a patent to the claimant since, because of changed economic conditions, the claim did not presently satisfy the test."

*Mulkern* 326 F.2d at 898).

In our view the mining laws, as construed by the cases, completely negate plaintiff's contention that the Secretary improperly considered the claim (amended by plaintiff's predecessor) as an original locator, thereby depriving plaintiff of rights historically acquired during the period 1896–1933 and obtained through the transfer of title.

The court considers next the question of existing discovery:

To support its contention that discovery existed at the time of the hearing, plaintiff relied primarily on two reports of its geologist submitted as supplements to its patent application. The first report was the result of sampling taken from August 7–10, 1961, and consolidated its samples into four areas.[9] For three areas the values were given as $0.168, $0.045, and $0.113 per yard, while the fourth area was listed as containing 31,000 yards of gravel valued at $0.421 per cubic yard. The Secretary found that these values of themselves did not amount to a discovery.[10] Plaintiff's report went on to state that virgin underwater gravels were also sampled below the dredged gravels which ranged in value from $0.60 to $6.90 per cubic yard, thereby concluding:

"These values are very good and warranted additional deep testing beneath the dredge tailings to ascertain the extent and grade of the virgin gravels."

This report recommendation, however, is merely one suggesting further exploration and is not enough to warrant a finding of discovery within the meaning of the mining laws. Evidence which is sufficient only to warrant further exploration is not sufficient to meet the "prudent man" test necessary to establish a valid mining claim. Henault Mining Company v. Tysk, 419 F.2d 766 (9th Cir. 1969).

Plaintiff's second report of sampling obtained October 28, 1963,[11] was thoroughly analyzed by the Hearing Examiner. Ten samples were taken,

9. Exhibit A, Patent Application.

10. IBLA 70–22 at 19.

11. Exhibit B, Patent Application.

nine of which were substantially below the cost of extraction accepted as $0.50 per cubic yard.[12] One sample in the southeast area of 123 pounds contained a 19-cent nugget which resulted in an assay value of $7.389 per cubic yard. The computation of this sample on a yardage basis resulted in a high assay value. Thus, by averaging this sample with the samples of low value, a weighted average value of $0.874 was applied to the various potential deposit areas containing 138,000 yards of placer material. However, the samples in the area to the north with 27,000 cubic yards averaged only $0.44 a cubic yard. The sample in the area to the west with 70,000 cubic yards was valued at $0.385. No sample was taken from the east-central area containing 2,500 cubic yards. The samples in the southwest area containing 26,000 cubic yards averaged $0.-275. The three samples in the southeast area containing 13,000 cubic yards, and from which the nugget was secured, were valued respectively at $0.004, $0.-146, and $7.389 with an average of $2.-513 per cubic yard. Thus, of the several areas containing placer materials on the claim, only one, the southeast area from which the 19-cent nugget was secured, containing 13,000 cubic yards, assayed at more than the cost of extraction. Moreover, the other two values taken in that same area were only valued at $0.04 and $0.146 per cubic yard.

The Government in its case presented the testimony of three mining engineers employed by the United States Forest Service. They examined the entire area of the claim in June and July, 1965, taking a total of 38 samples, of which at least 20 went to bedrock.[13] The samples were panned and the concentrates assayed for gold and silver. One sample (No. 2) contained a tiny nugget valued at 25 cents but no other colors. The assay of that sample, taken in gravel only

1.3 feet deep over bedrock, showed a theoretical value of $11.65 per cubic yard. Another sample (No. 28) taken in topsoil and gravel 3.9 feet deep over bedrock assayed for a theoretical gold value of $0.93 per cubic yard. But of the remaining 14 samples taken in this area, six showed values of less than one cent per cubic yard, five showed values of from one to five cents per cubic yard, and the other three samples showed values less than 32 cents per cubic yard. Moreover, of the 22 samples taken elsewhere on the claim, only five showed values of greater than 20 cents per cubic yard, and 16 showed values of less than five cents per cubic yard.[14] Consequently, the engineers considered that only small and scattered areas throughout the claim (around the sampled spots which had reasonable values) were suitable for placer operations; specifically only 2,654 cubic yards of gravel which contained an estimated gold value of $2,664. Moreover, government computation had ignored samples having ridiculously low values in the assay returns, which, if included, would have significantly decreased the average per cubic yard value.

The engineers' report noted that the one sampling (No. 2 in Area C) which contained the nugget valued at 25 cents accounted for approximately 74% of the total gold in the areas under consideration. Four additional samples were taken from this area and panned, but no colors were found in these samples and they were not submitted for assay. The report concluded that the tiny 231 mg. nugget found was an isolated bit of gold and not representative of the area. If that sample was deleted from calculations, even those few areas noted above which the engineers considered suitable would be reduced from a total value of $2,664 to $700.44, or a cubic yard value

---

12. Exhibit E, Patent Application; see also Hearing of Contest No. 034305 (Transcript at 162).

13. Exhibit 4, Hearing of Contest No. 034305 (Transcript at 63).

14. Sample 32 in Area E had a theoretical assay value of $0.9330 per cubic yard, but the weighted average value for Area E was only $0.3870 per cubic yard. (See n. 13).

of 31 cents and less than the cost of extraction.

As a result of their overall testing, the engineers concluded that the claim had been worked out and there was insufficient gold value left in the claim to justify an extraction operation.[15]

As to the question of non-metallic minerals, the Act of July 23, 1955 (30 U.S.C. § 611 (1964)) excluded common varieties of sand, stone and gravel from location under the mining laws so that a discovery based on a deposit of one of those materials had to be made prior to the date of the Act. There was no evidence adduced at the hearing that the sand and gravel were used or potentially marketable in quantity prior to that date. Therefore, the proceedings below found that the sand and gravel deposits did not constitute locatable deposits under the Act.

However, there was some testimony about usage of the stone which is available on the claim. There is evidence in the record that this stone is of a common variety which appears along the creek bed for miles. In order for this common variety of stone to be a qualifying deposit, it must have been valuable prior to the Act of July 23, 1955. There was no evidence that a substantial amount of stone had ever been removed from the claim. To the contrary, in fact, only about one truckload per week had been removed in the period from 1946 to 1957 for which $0.50 per truckload had been paid for a total annually of approximately $27.00 (or $9.00 per year per each of the combined three claims). The Hearing Examiner concluded that such meager returns merely confirmed the fact that an individual could earn a day's wages occasionally by picking up and transporting the stones elsewhere and did not constitute a valuable deposit. The decisions below affirmed that the sand, gravel and building stone on the claims are common varieties and that there was not a discovery of a valuable deposit of either material within the meaning of the mining laws prior to July 23, 1955.

The fact that a market exists for the once-a-week sale of a $0.50 truckload of stone tends in itself to be substantial evidence of a lack of marketability prior to 1955. "The 'marketability test' requires claimed materials to possess value as of the time of their discovery. Locations based on speculation that there may at some future date be a market for the discovered material cannot be sustained. What is required is that there be, at the time of discovery, a market for the discovered material that is sufficiently profitable to attract the efforts of a person of ordinary prudence." Barrows v. Hickel, 447 F.2d 80, 82, 83 (9th Cir. 1971); Verrue v. United States, *supra*, 457 F.2d at 1203–1204. We conclude that the record supports the Secretary's decision that the stone, sand and gravel deposits did not constitute discovery of valuable deposits of either materials within the meaning of the mining laws prior to 1955.

After carefully reviewing the entire record, this court concludes that the proper test for discovery was applied by the Secretary and his decision to reject plaintiff's application for patent of the Robe Roye-Martin-Missing Link placer mining claim due to lack of discovery of a valuable mineral deposit within the meaning of the mining laws, is supported by substantial evidence. The decision was therefore neither arbitrary, capricious, nor an abuse of discretion. The Secretary's decision must be affirmed, and the court therefore finds it unnecessary to reach the contingent issue as to the number of acres to which plaintiff may be entitled.

15. Page 9, Exhibit 4.