**COMPU SERVE DATA SYSTEMS, INC., Plaintiff,**

v.

**The Honorable Rowland G. FREEMAN, III et al., Defendants.**

Civ. A. No. 80–2327.

United States District Court, District of Columbia.

Oct. 17, 1980.

Paul G. Dembling and Mary Ellen Coster, Schnader, Harrison, Segal & Lewis, Washington, D. C., for plaintiff.

Kenneth M. Raisler, Asst. U. S. Atty., Washington, D. C., for federal defendants.

William A. Bradford, Jr., Hogan & Hartson, Washington, D. C., for other defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Before the Court is the plaintiff's motion for a preliminary injunction that would require the federal defendants to suspend activity on a contract being performed currently with Boeing Computer Services, Inc. ("Boeing"), the intervenor–defendant. Plaintiff, CompuServe Data Systems, Inc., ("CompuServe"), is a Delaware corporation with its principal places of business in Columbus, Ohio, and Washington, D. C. Defendant Rowland G. Freeman, III, Administrator of the General Services Administration ("GSA"), is also a defendant in this action. Other named defendants are the Department of the Army and its Secretary, Clifford L. Alexander, Jr. The latter three defendants are interchangeably referred to as federal defendants or the government.

On September 15, 1980, the plaintiff's motion for a temporary restraining order was denied[1] when the court found that CompuServe would not suffer irreparable harm and that the balance of the equities favored the intervenor–defendant, the federal defendants, and, ultimately, the taxpayers. Based on a further assessment of plaintiff's arguments and exhibits, the responses of the defendants, and oral argument, plaintiff has not demonstrated its entitlement to this preliminary injunction.

Plaintiff alleges a number of broad–based irregularities in the procurement process surrounding Request for Proposals CDPA–78–5 ("the RFP"), issued on November 16, 1978. The government issued that RFP on behalf of the Department of the Army, which sought to change and upgrade its computer system used to match up Army recruits with positions they might be interested in and to aid the Army in planning for future personnel needs. The plaintiff contends that the GSA changed the specifications required in the RFP toward the end of the procurement process–after the submission of best and final offers and after the completion of the Government Witnessed Benchmark ("the GWB"), where the procuring officials examine in person the system described in an offeror's proposal. The alleged changes concern the requirement for a Resource Consumption Routine ("the RCR"), the technical term for that part of a computer system that permits the user to audit the charges made for computer time used; the RCR calculates and dis-

---

1. Subsequent to the denial of the temporary restraining order, the Calendar Committee assigned this case to this Court for all purposes.

plays to the user the time taken for the program to run and any other items for which charges are made. CompuServe claims that it submitted a proposal that met the terms of the RFP, only to be advised after the GWB that its proposed RCR was deficient. The GSA treated the offerors unequally, plaintiff declares, both because it did not permit CompuServe to amend its proposal to meet the allegedly newly imposed requirements and by its improper negotiations with Boeing after the submission of best and final offers.

The plaintiff vigorously argues that it will be irreparably harmed without injunctive relief since the General Accounting Office ("GAO"), in acting on the protest filed by CompuServe,[2] may decide not to terminate the Boeing contract even though it finds that the procurement was illegal. CompuServe's fear is that as the performance of the contract continues uninterruptedly, this will enhance the possibility, as has previously occurred in some other cases, of the GAO agreeing with plaintiff's position that the Boeing contract procurement was illegal, but finding termination of the contract to be an inappropriate remedy because it had been substantially performed.

CompuServe also claims that its contract was 33% less expensive to the government than the Boeing agreement, so the public interest lies with the smaller expenditure of the taxpayers' money for equal services. As to the interest of third parties, CompuServe's view is that because performance of the contract is in its infancy, Boeing would not suffer substantial harm from the injunction, and in any event, the total loss CompuServe would suffer as a result of the allegedly illegal contract award would outweigh the injury to Boeing of an early termination.

The federal defendants maintain that the procurement process was legal and in accord with applicable regulations. Prior to the GWB, the government contends, the

CompuServe proposal seemed to satisfy the RFP and its best and final offer was therefore deemed satisfactory. It was during and after the GWB, especially in the oral briefing immediately following the Benchmark, that the technical evaluators recognized the deficiencies in CompuServe's RCR. Contributing to its late discovery of CompuServe's problems, the government claims, was its decision to delay the required sharing of proprietary information by the offerors until the last possible part of the procurement process, to protect the offerors. Thus, the government contends that only oral discussions after the GWB and subsequent correspondence revealed severe deficiencies in CompuServe's RCR and that the inadequacies were directly related to the government's ability to audit the computer charges. The government declares it attempted to clarify in writing with CompuServe the problems in the RCR but CompuServe allegedly admitted then that it could not provide the audit capability that the government requested. After further deliberations, the GSA disqualified CompuServe and awarded the contract to Boeing. The government also avers that its communications with Boeing after the best and final offers were submitted were perfectly proper and concerned minor clarifications.

The federal defendants refute plaintiff's claim of irreparable harm absent injunctive relief, arguing that the performance of this contract is not nearly so substantial as to cause the GAO to refuse to recommend termination were there a finding of illegality. Concerning the public interest, the government contends that conversion to the new contract will realize taxpayers' savings of $6,000 to $15,000 per day, the exact amount depending on how close to the RFP's estimates the Boeing computer usage comes. The government also posits that delay in the conversion from the incumbent

---

2. A conference was held on this protest on September 5, 1980, and both parties have filed the post-conference comments. The action is ripe for decision by the GAO and that Office's guidelines note that such decisions take at least twenty–five working days. It is respectfully urged that the GAO reach its decision in this matter as promptly as possible to clarify the parties' future direction.

contract would disrupt the draft registration program and cause harm to the party implementing the conversion, Systems Automation Corporation ("SAC"). The balance of equities, in the government's view, points toward maintenance of the *status quo* pending the GAO's resolution of the CompuServe protest; in other words, the Boeing contract should be performed on schedule.

The intervenor–defendant Boeing suggests a factual pattern similar to that described by the federal defendants. Boeing focuses on areas of the dispute relevant to its interest. First, Boeing addresses the harm that it would suffer if this Court granted the requested relief. Boeing has already committed personnel to the contract, has sold $1,500 worth of computer time to the Army, and partly in reliance on the Army contract, has ordered a $1.3 million computer unit scheduled for delivery in November, 1980. Were this Court to order that performance cease on the contract, Boeing ponders that it may have to cancel that order and, should the contract be later reinstated, face a six to nine months delay for a reorder, a delay that would jeopardize the government's interests as well.

Second, Boeing insists that the communications it had with the GSA after the submission of best and final offers were wholly proper. These communications, Boeing alleges, can be divided into two categories. The first concerned an attempt by Boeing to increase and adjust its price which the GSA denied. The second group of correspondence involved minor clarifications in the actual contract price, adjustments which Boeing claims were in accord with applicable procurement regulations.

■ The plaintiff must satisfy four requirements for a preliminary injunction. It must demonstrate that there is a substantial likelihood that it will succeed on the merits, that it would suffer irreparable harm without injunctive relief, that no substantial harm would accrue to the interests of third parties and lastly, that an injunction would serve the public interest. *Virginia Petroleum Jobbers Association v. Fed-*

*eral Power Commission*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). It if appears that there is compelling proof on the showing of irreparable harm, then the Court may award the requested relief even though its view on the merits of the dispute differs from the plaintiff's. *See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 182 U.S.App.D.C. 220, 223–24, 559 F.2d 841, 843–44 (1977).

### I. *Likelihood of Success on the Merits.*

■ The dispute over the merits in this case centers on two broad issues, whether the CompuServe proposal met the requirements of the RFP and whether GSA treated CompuServe unequally. The first of these issues concerns precisely the question whether CompuServe's RCR met the specific requirement of the RFP that the government be able to audit each specific variable used to calculate the computer charge. The second question to be resolved is whether GSA acted improperly either in communicating with Boeing after the submission of best and final offers or in rejecting CompuServe's proposal without giving it a further opportunity to correct it.

### A. *CompuServe's RCR.*

There are two components to the inquiry of whether the plaintiff has demonstrated a substantial likelihood that it could prove that its proposal met the requirements of the RFP. The dispute concerns CompuServe's calculation of central processor usage, or CPU, the measure of the time used in processing the program, and CompuServe's method of dynamically allocating memory space both before the running of the program and during the run itself. Both aspects of the dispute center directly on the government's ability to audit the charges made under the contract.

Brief background discussion is necessary. The government was clearly dissatisfied with its ability to audit the precise elements of the charges for which it is billed for Army usage under the incumbent contract. Accordingly, a computer system was sought that would permit government auditors to

examine the precise elements that combined into the resulting charge, to assure accurate billings. For the auditing to take place, whatever elements making up the final charge had to be calculated and displayed separately, or in an "unbundled" fashion. It was, therefore, to facilitate the important goal of auditing the expenditure of the taxpayers' money, that the GSA included in the RFP the following requirements:

¶ F.2.2.4.4b ... A routine shall be provided to the Government which will record and point out the Elapsed Time ... and all computer resources consumed during the execution of any program to which the routine is applied. The purposes of this routine are to provide the Government with a tool for use in auditing system performance and costs, and in optimizing application software during development ... The printout must display specifically and separately all unique resource elements for which a charge is made. Any elements that are bundled to produce a compound billing unit of any kind shall be displayed and quantified separately (unbundled) ....

. . . . .

The basic requirement is that all elements which, directly or indirectly impact on the bill must be displayed in their fundamental unbundled form.

. . . . .

¶ 4.2.3a. The offeror shall provide a resource consumption routine which shall measure and display ... the elapsed time utilized for each program ... and the types and quantities of all resources consumed by the program for which any charge is made. ... However, if any or all of the specific resource elements consumed are bundled, the routine provided shall identify, display and quantify the bundled elements in an unbundled form ... as well as the elements which are not a part of the bundle.

It appears that as to the calculation of CPU, the probability of success lies with the government. As to CPU, the government discovered at a briefing on February 8, 1980, that CompuServe's method of calcu-

lating CPU, or as CompuServe refers to it, $T_a$, combines two elements, the number of instructions the computer is directed to execute ("E") and the amount of memory access utilized ("M"). CompuServe admits that nowhere does it display or calculate these two units separately. The fact that the CPU is divided into two units, E and M, at all, appears to bundle elements in apparent violation of the RFP, abrogating the government's determined ability to audit separately each aspect of the calculated computer charge.

As to the dynamic allocation of memory matter, the probability of success appears also to lie with the defendant. The government sought a computer system that would not fix for all programs the amount of memory space used. Rather, the Army's desire for a more efficient use of memory space prompted the requirement for a computer that would calculate in advance of the program's run the amount of memory space needed to complete the program; thus, those functions that required only a small amount of memory space would not result in charges to the government for the use of more space than needed. CompuServe, it appears, provided, on the surface, a more efficient system. Its method of dynamically allocating memory space seemingly calculates the necessary memory space not only before run time but also during the run of the program. Accordingly, if one part of the program required less memory space than another part, the government would be charged only for that lesser amount for that particular function, and the total charge for the program's run would reflect the combination of the precise allocations of memory space at each function in the program where memory was allocated. CompuServe's more efficient method of memory allocation was nonetheless troubling because the government needed to audit each element of the charge for memory space used. Although CompuServe's system calculated the differing amounts of memory space utilized, it neither displayed that calculation nor permitted the government to audit the calculation.

Apparently, the government had to take CompuServe's system on faith that the final charge for memory space used was an accurate calculation of the various component charges set during the stages of the program.

Let it be understood, clearly, that this Court makes no pretension of expertise in or adjudication of the state of the art in computer audit technology. Today's decision reached on these highly technical points is based solely on those accounts presented at this time that help to crystallize the Court's judgment of the probability that the government can show that CompuServe did not meet the requirements of the RFP. The language of the RFP is unambiguous—the government wanted to audit *each separate component* of the final charge, and it appears that in both the calculation of CPU and the allocation of memory space, CompuServe bundled elements of that final figure in such manner as to preclude the government from auditing the usage precisely.

### B. *Unequal Treatment and Improper Conduct by GSA.*

CompuServe maintains that there is a substantial likelihood that it would prevail on the merits of this dispute on the question whether GSA acted improperly in communicating with Boeing after the submission of best and final offers. Based on the affidavits and exhibits, thus far submitted, the Court cannot agree that improper conduct by GSA is likely to be established. The affidavit of Peter O'Such, Contracting Officer, Automated Data and Telecommunications Service, GSA, demonstrates that the various communications between Boeing and GSA concerned a number of minor matters, all apparently within the purview of 32 C.F.R. § 3–805.3(b), which permits the procuring agency in select circumstances to communicate with a single offeror without reopening the negotiations to all offerors. Some of the correspondence involved adjustments to Boeing's GWB, others concerned cost reconciliations occasioned by arithmetic errors and an attempt by Boe-

ing, rejected by GSA, to increase the price of the contract. These communications do not appear to prejudice either CompuServe or the other party in negotiations.

As to CompuServe's allegation that it was denied an opportunity to amend its proposal to compensate for its delayed notification by GSA of the deficiencies in the RFP, it would seem that GSA did not act arbitrarily in refusing to permit CompuServe to alter its proposal. The RFP speaks for itself in unequivocal terms: there was to be capability extant to audit each element specifically. When at the oral briefing and in the correspondence following the meeting in February, 1980, the government discovered the problem with CompuServe's RCR, it was within its discretion to disqualify CompuServe from the bidding for failure to meet the terms of the RFP. It is not apparent now, at this juncture, that the disqualification decision was an abuse of discretion nor can the Court find that CompuServe will be able to show that no rational basis supported the disqualification. *See M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 233, 455 F.2d 1289, 1301 (1971).

### II. *Irreparable Harm.*

■ Can CompuServe, nonetheless, demonstrate severe, irreparable damage from a failure to enjoin performance? It would appear not, at this time.

CompuServe's irreparable harm proffer is dependent on hypothesizing two separate events. The plaintiff first urges the Court to assume that the GAO would find that the procurement process for this contract was illegal and that the contract should have been awarded to CompuServe. Second, the plaintiff reasons that, should there be this finding of illegality, then GAO may determine that the performance of the contract was too far along for it to recommend termination, leaving CompuServe only to recoup its costs of preparation for the procurement. It is only under this combination of circumstances that CompuServe will be irreparably harmed.

These suppositions, singly and jointly, are far too speculative to disrupt the procurement process and stifle performance of this important contract with an injunction pending resolution of the GAO protest. The government concurs that the commitment of resources by both defendants and by SAC is not so substantial as to fix the GAO's placement of the contract for economic reasons, assuming the contract is found wanting. This agreement is scheduled for five years, and even assuming that the GAO does not act for several months on CompuServe's protest, the vast majority of the contract would remain to be performed. *See Honeywell Information Systems, Inc.,* 56 Comp.Gen. 505, 511–13 (1977) where the GAO decided not to let the prejudicial effect of the procurement process stand for the duration of a five year contract, and the Office accordingly recommended to terminate. CompuServe therefore does not establish here that it would suffer irreparable harm with denial of the injunction.

### III. *Harm to Third Parties and the Public Interest.*

 It is CompuServe's position that an injunction would cause no harm to third parties and indeed that enjoining this contract would benefit the public. The plaintiff's assertion that its contract cost $2.1 million less than the Boeing agreement, not including any modifications in order to satisfy the RFP's requirements of unbundled billing elements, is clearly impressive and worthy of intense consideration. But a number of aspects of this transaction serve to tip the balance against the plaintiff. The federal defendants (and thereby the taxpayers) would lose at least $6,000 and possibly $15,000, per day for each day that the incumbent contract remained in effect. (The exact figure depends on how close the Boeing agreement comes to the estimates in the RFP of usage under the new contract.) Boeing has also expended resources in staffing and training personnel for the conversion process. Boeing may too, face the loss of its order of a $1.3 million computer, an order made, partly on reliance of the Army contract. Unquestionably, an injunction

here would disrupt generally the procurement process, as well as possibly affect the implementation of the draft registration programs.

Absent enormously compelling circumstances, it is against the public interest to enjoin performance of a contract pending GAO's resolution of the protest. Without a showing by the plaintiff of patently unfair treatment or a denial of its due process rights, the Court must be reluctant to enjoin contract performance. Injunctive relief would be extraordinary in this case, affecting substantially the public interest as well as that of Boeing, GSA, the Army, and SAC. The showing of plaintiff's harm in this dispute is too speculative to balance against those third party and public interests.

In sum, CompuServe has not shown a strong likelihood of success on the merits, either that it met the requirements of the RFP or that it was treated unequally. The plaintiff has also not demonstrated irreparable harm absent injunctive relief except in a truly hypothetical manner. The public interest would be best served by maintaining the *status quo,* permitting the contract to continue in its conversion phase.

As to the present status of this case, the plaintiff sought only the limited relief of a preliminary injunction to halt the performance of the contract pending resolution of the GAO protest filed by the plaintiff. That injunction has now been denied. The case must therefore be dismissed but without prejudice to instituting any subsequent claim on the merits as may be appropriate.

Therefore, it is this 17th day of October, 1980

ORDERED that the plaintiff's motion for a preliminary injunction be, and hereby is denied, and it is

FURTHER ORDERED that this case be dismissed without prejudice.