S.A. HEALY COMPANY, and Vanessa General Builders, Inc., Plaintiffs,

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.

Civ. A. No. 85–1751.

United States District Court, District of Columbia.

Aug. 14, 1985.

---

Robert G. Watt, Garry R. Boehlert, Watt, Tieder, Killian & Hoffar, Vienna, Va., for plaintiffs.

Sara E. Lister, Gen. Counsel, Robert L. Polk, Associate Gen. Counsel, Frank R. Filiatreau, Jr., Asst. Gen. Counsel, Washington, D.C., for defendant.

Stanley O. Sher, Billis, Sher & Jones, Washington, D.C., for amicus curiae Mergentime Corp. and Perini Corp.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

Plaintiffs S.A. Healy Company and Vanessa General Builders, Inc., bid as a joint venture on an Invitation to Bid (IFB) issued by the Washington Metropolitan Transit Authority (WMATA) for construction of the Greenbelt Route Shaw Station and Tunnel, extensions of WMATA's subway system funded in part by the Urban Mass Transportation Agency of the Department of Transportation (DOT/UMTA). The IFB, Appendix B, required all bidders to participate in WMATA's Affirmative Action Plan by subcontracting to, or participating in, a joint venture with a disadvantaged business enterprise (DBE), an enterprise owned and controlled by disadvantaged persons, which would be responsible for, and perform, at least 20 percent of the work on the contract. Healy made the low bid of $49.4 million and indicated at the time of its bid its intent to meet its affirmative action obligation by arranging for Vanessa, the minority owned partner, to perform 20 percent of the work on the contract.

Vanessa had not previously been certified as a DBE. Accordingly, WMATA's Office of Civil Rights (CIVR) held a certification hearing. The chief executive officer of Vanessa, Mr. Ishmel Harps, Sr., and Vanessa's president, Ishmel Harps, Jr., represented the company at the hearing. Information on the record indicated that the biggest jobs done by Vanessa in the last three years ranged from $103,000 to $600,000 undertakings. WMATA Minority Business Enterprise Disclosure Affidavit (Feb. 25, 1985). Mr. Harps, Sr., testified that out of the 35 full time employees listed in his son's affidavit of February 5, 1985, three to four were black, the rest were white. Transcript, In the Matter of: Vanessa Builders Incorporated, before the WMATA Office of Civil Rights Business Enterprise Certification Review Board at 27. As to the company's line of credit, Mr. Harps, Jr., testified:

No, [we do not have a line of credit] at this time. Because we can't get a line of credit until the—in the process now of getting our records straight. I mean nobody is going to give you a line of credit.

Tr. at 83. Both the Harps' confirm, "[w]e have no bonding." Tr. at 48. Mr. Harps, Jr., continued: "We never had to provide bonds." Tr. at 57. Moreover, the company has no payment bond capability. Tr. at 59.

As far as liability on its projects, Vanessa has "absolutely no responsibility." Tr. at 62. For one nine month period, the firm listed telephone expenses of only $296.54 and travel expenses of only $303. Tr. at 40. CIVR officials also questioned the validity and accuracy of the Vanessa tax returns which formed the basis of the Harps' testimony on their finances. Tr. at 64, 92. Finally, Vanessa's total equipment consists of one truck, two pickups, one sedan, welding machines and construction tools. Tr. at 23. Concluded one review board member:

Vanessa Builders is nothing but a broker, if you would, for large corporations trying to satisfy their minority business input. They have 14 jobs and all but one is federally funded.

Tr. at 90.

Based on the evidence received at its hearing, the CIVR refused to certify Vanessa as a qualified DBE, and thus Healy-Vanessa as a qualified joint venture,[1] on the grounds that (1) the disadvantaged person who purported to be the president of Vanessa did not have independent control of its day-to-day operations, and (2) Vanessa did not have adequate financial structure and resources to support this contract in addition to all the other contracts that it was performing.[2] On May 7, 1985, CIVR denied Healy-Vanessa certification as a DBE for a third reason: there was no agreement requiring Vanessa actually to perform any part of the contract work. Letter from Claude Swanson, Director CIVR, to Donald M. Zeier (May 7, 1985).

After the certification denials, the WMATA Contracting Officer informed Healy-Vanessa that although he found their bid responsive, as part of his responsibility[3] determination he would have to conduct an inquiry into whether Healy-Vanessa's bid represented a good faith commitment to the DBE requirement of Appendix B. Healy-Vanessa wrote to the Contracting Officer in defense of its own good faith. Healy-Vanessa also offered to substitute five DBE subcontractors already certified by WMATA to fulfill the 20 percent minority participation requirement. Healy-Vanessa had obtained these commitments prior to bid submission. Affidavit of Donald J. Zeier at 5 (May 30, 1985). The Contracting Officer, however, found Healy-Vanessa's response not sufficient to meet the good faith requirement of Appendix B. According to the Contracting Officer:

[T]he principals of Vanessa admitted to a complete lack of bonding capacity, which showed that they did not understand that bonds were essential for a contract of

---

1. The eligibility standard for certification as a joint venture is contained in 49 C.F.R. § 23.-53(c) (1985):

    A joint venture is eligible under this part if the MBE partner of the joint venture meets the standards for an eligible MBE partner set forth above and the MBE partner is responsible for a clearly defined portion of the work to be performed and shares in the ownership, risks, and profits of the joint venture.
    Section 23.53(g) further provides:
    Except as provided in § 23.55, the denial of a certification by the Department or a recipient shall be final, for that contract and other contracts being let by the recipient at the time of the denial of certification. MBEs and joint ventures denied certification may correct deficiencies in their ownership and control and apply for certification only for future contracts.

2. According to the CIVR:
    The authority could not determine the financial structure of your company. As an example, your balance sheet of September 30, 1984

shows a negative balance in one checking account of $5,753.91 and $16,184.68 in another. However, you personally verified that you do not have a line of credit with any financial lending institution; and, therefore, you could not adequately explain overdrafts in Vanessa General Builders, Inc. bank accounts.
Letter from Claude R. Swanson, Director CIVR, to Ishmel Harps, Jr. (April 19, 1985).

3. The difference between the determination that a bid is responsive, and that a bidder is responsible is set out in *A. Metz, Inc.*, B–213518 84–1, CPD ¶ 386 (April 6, 1984):
    Responsiveness concerns whether a bidder has unequivocally offered to provide supplies and services in conformity with the material terms and conditions of the solicitation; responsibility refers to a bidder's apparent ability and capability to perform the contract requirements.
    *A. Metz, Inc.* at 7. A bidder must pass both tests in order to be awarded a government contract. *See* WMATA Procurement Regulations at ¶ 7.

this magnitude. Further, the principals had no line of credit to aid in financing the work. Moreover, the joint venture agreement does not contain any requirements for Vanessa to perform a clearly defined portion of the work as required by 49 CFR 23.53(c), nor does the joint venture agreement require any specific amount of financing by either party but permits, where there is a lack of working capital, execution of a note in satisfaction thereof.... This type of business arrangement in connection with the accomplishment of an important construction contract raised serious concerns as to whether the joint venture's bid constituted a good faith attempt to comply with the requirements of Appendix B.

Letter from John S. Egbert, Contracting Officer, to Robert G. Watt (June 10, 1985). Consequently, the Contracting Officer found Healy-Vanessa's bid non-responsible and awarded the contract to Mergentime Corporation and Perini Corporation, the second lowest bidder in the amount of $50,-895,000.[4] Determination of Contractor Non-Responsibility by John S. Egbert, Contracting Officer (May 15, 1985). Mergentime-Perini has since appeared in these proceedings by leave of Court as amicus curiae. WMATA and Mergentime-Perini represent without contradiction that its contract will be performed with 20 percent participation by certified minority subcontractors. Transcript, Telephone Conference (Aug. 12, 1985).

On May 30, 1985, both Vanessa, individually, and Healy-Vanessa, as the joint venture, appealed their denials of certification to the Secretary of Transportation pursuant to 49 C.F.R. § 23.55, which sets out the procedure for appeals of denial of certification as a DBE. Healy-Vanessa also filed a protest with DOT/UMTA and, at the same time, filed a Motion For Temporary Restraining Order, Preliminary Injunction, Declaratory Judgment and Other Relief in

this Court. By order of June 3, 1985, this Court denied plaintiffs' motion for temporary restraining order, in reliance on the representation by defendant's counsel that it would not immediately award the contract to Mergentime-Perini. An Order of June 27, 1985, stayed all proceedings awaiting initial action by DOT/UMTA. The parties continued, however, to brief the preliminary injunction motion and the summary judgment motions. On July 30, 1985, DOT/UMTA issued its decision affirming WMATA's denial of the contract to Healy-Vanessa. Letter from Peter N. Stowell to Robert G. Watt (July 30, 1985). This matter is now before the Court on the parties' cross motions for summary judgment.

## II.

Healy-Vanessa advances two challenges to the WMATA decision. First, plaintiffs claim that WMATA's inquiry into the good faith of the joint venture bid was in violation of federal law. Second, plaintiffs argue in effect that the result of WMATA's good faith inquiry was not supported by substantial evidence.

## A.

Both parties agree that the standard of review to be applied to the WMATA bid award is embodied in *Steinthal & Company v. Seamans*, 455 F.2d 1289 (D.C.Cir. 1971). S.A. Healy and Vanessa General Builders, Inc., A Joint Venture's Reply to the Washington Metropolitan Area Transit Authority's Opposition to Healy-Vanessa's Cross-Motion for Summary Judgment (Plaintiffs' Reply) at 21 (filed July 8, 1985); Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment (Defendant's Motion for Summary Judgment) at 7 (filed June 13, 1985). This standard provides:

[C]ourts should not overturn any procurement determination unless the ag-

---

**4.** Counsel for WMATA indicated at a status conference held on August 2, 1985, that the agency had only until August 24, 1985, to make a final award of the contract to Mergentime-Perini. The Court has thus expedited consideration of this matter and expects that this ruling today will give plaintiffs sufficient time to seek emergency relief in the Court of Appeals should they so desire.

grieved bidder demonstrates that there was no rational basis for the agency's decision.... [The court's] inquiry must fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations.... Only when the court concludes that there has been a clear violation of duty by the procurement officials should it intervene in the procurement process and proceed to a determination of the controversy on the merits.

455 F.2d at 1301, 1303.

The DOT/UMTA rejection of plaintiffs' bid protest is not binding upon the court, but may be viewed as advisory:

The court has the last word, but it can properly seek the benefit of whatever contributions can be made by an agency whose "area of specialization" embraces problems similar to or intermeshed with those presented to the court.

*Wheelabrator Corporation v. Chafee,* 455 F.2d 1306, 1316 (D.C.Cir.1971) (citation omitted). The DOT/UMTA, like the GAO in *Wheelabrator Corporation,* is an agency of special competence. Consequently, "the court may properly take into account [the DOT/UMTA's] concurrence [in WMATA's denial of certification to Healy-Vanessa] ... although the court does have the last word." *Id.*

### B.

■ Plaintiffs' contention that because Healy-Vanessa met the good faith standard of 49 C.F.R. § 23.45(h)(2), the Contracting Officer's determination was in error, is vulnerable to a short answer and therefore is addressed first. Assuming, *arguendo,* that WMATA's good faith inquiry was itself lawful, there is ample evidence on the record to support the Contracting Officer's determination that because of Vanessa's obvious lack of ability to perform 20 percent of the contract work, Healy-Vanessa as a joint venture lacked good faith in proposing Vanessa to satisfy the DBE re-

quirement. *See* Tr. of CIVR Hearing. Healy knew or should have known the palpable defects in Vanessa's qualifications. To proffer it as a 20 percent partner in a $50 million subway construction contract is, manifestly, not in good faith.

### C.

■ Healy-Vanessa's other claim is that WMATA's decision fails to meet the *Steinthal* standard because it was made in violation of federal law embodied in 49 C.F.R., Part 23, which governs the award of contracts for which contract goals have been set. Section 23.45(h) provides:

(2) If the MBE participation submitted in response to paragraph (h)(1) of this section does not meet the MBE contract goals, the apparent successful competitor shall satisfy the recipient that the competitor has made good faith efforts to meet the goals.

49 C.F.R. § 23.45(h)(2) (1985). Plaintiffs contend that WMATA violated this federal regulation by subjecting Healy-Vanessa to a "good faith efforts" test once WMATA determined that Vanessa was not a qualified DBE, instead of allowing Healy-Vanessa to substitute other certified DBE's to meet the minority participation goals. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment (Plaintiffs' Opposition) at 10 (filed June 25, 1985).

Specifically, plaintiffs claim that an integrated reading of subsection (h) shows that a "good faith efforts" examination is not proper if a bidder satisfies its commitment to DBE goals any time before award of the contract. Plaintiffs' Reply at 5. Plaintiffs also cite decisions of the Comptroller General which state that a prime contractor may substitute a fresh MBE subcontractor after bid opening, but before award, when the named MBE subcontractor fails to win certification.[5] But the prime contractors in

---

5. *E.g., Richard Hoffman Corporation,* B–216308, 85–1 CPD ¶ 88 (Jan. 23, 1985); *A. Metz, Inc.,* B–213518, 84–1 CPD ¶ 386 (April 6, 1984); *Paul*

*N. Howard—Reconsideration,* B–19915.2, 81–2 CPD ¶ 42 (July 17, 1981); *Paul N. Howard Company,* B–199145, 80–2 CPD ¶ 399 (Nov. 28, 1980).

the GAO cases cited by plaintiffs did not know that the minority subcontractors originally selected did not qualify.[6] By contrast, Healy-Vanessa knew or should have known that Vanessa was not financially able to perform 20 percent of the work, could not make a bond, and had bids from subcontractors which it could substitute if, after bids were opened, Healy still wanted the contract.[7] Healy's knowledge of these facts distinguishes this case from those permitting a prime contractor to substitute a qualified minority subcontractor for another who proved, on inquiry, to be unqualified.

Plaintiffs also fail to observe that the regulation explicitly allows the recipient, here WMATA, to select the time at which DBE information is to be submitted. Subsection (h)(1)(ii) of Section 23.45 provides:

> (ii) The recipient may select the time at which it requires MBE information to be submitted. *Provided*, that the time of submission shall be before the recipient commits itself to the performance of the contract by the apparent successful competitor.

**6.** Amicus curiae in its Response to Plaintiff's Memorandum of August 12, 1985 at 5 n. 3, succinctly distinguishes these cases:

> [I]n *Paul N. Howard Company*, ... the Comptroller General emphasized that the bidder was "well intentioned" and could not have known of the independent subcontractor's lack of DBE status "until well after bid opening." Similarly, in *A. Metz, Inc.*, ... the Comptroller General affirmed a procuring entity's finding that a bidder submitted sufficient evidence of good faith in attempting to meet DBE requirements prior to submitting its bid. In *Richard Hoffman Corporation*, ... the contractor's shortfall in its proposal—less than one-half of one percent—was considered "too negligible a difference to cast doubt on that firm's commitment to the MBE goal."

**7.** A Dunn & Bradstreet Report on Vanessa shows the following:

02/06/85  Interim Statement dated SEP 30, 1984:

| Cash | $ (21,327) | Accts Pay | $ 120,861 |
|---|---|---|---|
| Account Rec | 180,511 | Notes Pay | 6,405 |
| | | Due Former Owner | 1,000 |
| | | Taxes | (505) |
| | | Loans & Adv-Princ | 219,200 |
| Curr Assets | 159,184 | Curr Liabs | 347,561 |
| Fixt & Equip | 20,818 | | |
| Deferred Charges | 2,191 | | |

49 C.F.R. § 23.45(h)(1)(ii) (1985). Appendix B to the IFB sets out WMATA's timetable. Under the IFB, WMATA requires each bidder to submit with its bid a "Schedule of MBE [Minority Business Enterprise] Participation" which states how the bidder plans to satisfy the DBE goals of the IFB. Appendix B provides in certain limited circumstances for substitution of another subcontractor for one named in the submitted schedule:

> Except as provided herein, the successful bidder (Contractor) shall not have the work performed or the materials or supplies furnished by any individual or firm other than those named in the Schedule of DBE/WBE Participation. The Contracting Officer may permit substitution of a subcontractor for one named in unusual situations upon submission by the successful bidder (Contractor) of a complete justification therefore. The term "unusual situation" includes, but is not limited to, a subcontractor's:
>
> a. Failure to qualify as a DBE/WBE business enterprise.[8]

| Loans to Shareholders | 7,250 | | |
|---|---|---|---|
| Loans REc | 16,700 | CAPITAL STOCK | 20,201 |
| Loans to Former Onwer [sic] | 13,039 | RETAINED EARNINGS | (148,579) |
| Total Assets | 219,183 | Total | 219,183 |

Dunn & Bradstreet Report on Vanessa General Builders, Inc. (March 29, 1985).

**8.** Other grounds for substitution of a subcontractor for a named subcontractor are:

b. Death or physical disability, if the named subcontractor is an individual.

c. Dissolution, if a corporation or partnership.

d. Bankruptcy.

e. Inability to furnish a reasonable performance and payment bond.

f. Inability to obtain, or loss of a license necessary for the performance of the particular category of work.

g. Failure or inability to comply with a requirement of law applicable to contractors, subcontractors, or construction, alteration, or repair projects.

h. Failure or refusal to execute the subcontract in accordance with the terms of an offer submitted to the Contractor or bidder prior to the latter's submission of its bid, but only where the Contracting Officer can ascertain with reasonable certainty the terms of such

IFB, Appendix B at ¶ 6. However, this provision in the IFB which allows substitution of a subcontractor after submission of the original DBE information is permissive, not mandatory. The Contracting Officer *"may permit substitution,"* but is not *required* to do so.[9]

As WMATA points out, and DOT/UMTA confirms, plaintiffs' reading of 49 C.F.R., Part 23 combined with Appendix B of the IFB also raises policy concerns. A decision setting aside WMATA's ruling here "would permit a bidder to gain an advantage over other bidders after bids were disclosed by being able to decide whether or not to argue whether its bid was valid." Letter from Peter N. Stowell to Robert G. Watt (July 30, 1985) at 4. For example, if Healy felt, after seeing other bids, that its bid was too low for its comfort, it would retain the practical option of forfeiting the contract by acquiescing in a challenge to Vanessa's qualifications and not attempting to substitute the subcontractors. Moreover, if the subcontractors were substituted, there was no genuine role for Vanessa to perform. Yet it purported, even after substitution, to remain in place as a 20 percent partner in a joint venture. WMATA could reasonably conclude that this was unacceptable.

Plaintiffs seem to treat 49 C.F.R., Part 23 as authorizing a good faith inquiry only if a prime contractor fails to substitute subcontractors. Yet the regulation is not, as plaintiffs seem to argue, an "exclusionary rule." Plaintiffs had no legal right to be free from inquiry about Vanessa's financial responsibility, ability to make bond, and the motivation for holding back the subcontractors' bids. WMATA had a legal right to conduct that inquiry and to act on the information developed in it to determine whether the 20 percent joint venture was genuinely capable of performing 20 percent of the work, as was represented in the bid. Thus, in making its DBE responsibility determination in this case WMATA was not violating federal law, but rather discharging its public responsibility. Nor did WMATA evade, or fail to achieve, the affirmative action objective required of it. It is uncontested that Mergentime-Perini will perform the contract with 20 percent minority participation.

In sum, the statute, itself, and the DOT's opinion taken as a contribution from an agency with special expertise, *Wheelabrator Corporation,* 455 F.2d at 1316, indicate that WMATA did not violate federal law by failing to consider Healy-Vanessa's proffered substitute DBE's. It was within WMATA's discretion to reject Vanessa as an irresponsible joint venture not capable of performing either its proffered role as a DBE or a role as a 20 percent prime contractor responsible for five certified subcontractors. An accompanying order will grant defendant's motion for summary judgment and deny the cross motion filed by plaintiffs.[10]

offer. In the absence of any other factors, such a failure or refusal will be considered an unusual situation only if the bidder obtained, prior to bidding, an enforceable commitment from the subcontractor involved.

i. Failure to comply with the terms and conditions of this contract or those of its subcontract or joint venture agreement.

IFB, Appendix B at ¶ 6.

9. Moreover, although WMATA did not address the issue in its decision, Appendix B only permits substitution of a named *subcontractor* for a named *subcontractor.* It does not cover a situation where one of the prime contractors assumes responsibility for the MBE function and then proposes to subcontract. In this case, Healy proffered Vanessa as a 20 percent partner on a $50 million contract. The difference between a joint venture partner and a subcontractor is significant. Joint venture partners must "be responsible for a clearly defined portion of the work to be performed," as well as "share[ ] in the ownership, risks, and profits of the joint venture." 49 C.F.R. § 23.53(c) (1985). Moreover, unlike subcontractors, joint venture partners are parties to the bid. These factors make it at least rational for WMATA to distinguish between the substitution of joint venture partners and non-party subcontractors.

10. In light of this memorandum, plaintiffs' motion for preliminary injunction will be denied as moot.